**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

United States of America,

              Plaintiff,

    v.

Lance K. Bradford,

              Defendant.

Case No. 2:19-cr-00222-GMN-BNW

**REPORT AND RECOMMENDATION**

## I.    Introduction

Before the Court is Defendant Bradford's motion to suppress. ECF No. 87. The Court held a multi-day evidentiary hearing (ECF Nos. 108, 109, 128), after which the parties were instructed to provide supplemental briefing. Because many briefs had been filed before and during the hearing, the Court ordered the parties to include everything they wanted considered in their supplemental briefs. ECF No. 128. These supplemental briefs were filed at ECF Nos. 133, 137, and 139.

The basic facts of the case are as follows: In 2015, the government began investigating Bradford for tax evasion and a kickback scheme related to a contract involving the Hoover Dam. At the time, Bradford worked at a company called LL Bradford CPAs (LLB).

As part of the government's investigation, they spoke with several former employees of LLB about Bradford's alleged tax evasion. One former employee, Henry Ip, provided the government with a thumb drive containing documents he took from LLB related to Bradford's alleged tax evasion (the Ip drive). Evidence offered at the hearing suggested Ip took some tax documents after he left by hacking into LLB's server.

Eventually, the government applied for a search warrant to search LLB. The affidavit that accompanied the warrant was based, in part, on the documents provided on the Ip drive. The affidavit also provided other information that corroborated the documents on the Ip drive and

independently suggested Bradford was engaged in tax evasion. The court found probable cause existed and issued the warrant. LLB was searched, and several documents were seized.

Bradford now moves to suppress the seized evidence under *Franks v. Delaware*, alleging that the affiant recklessly omitted material information from the affidavit about how Ip obtained the documents on the Ip drive (by hacking into LLB's server). 438 U.S. 154 (1978). Bradford argues that this omitted information undermined Ip's credibility and called into question the authenticity of the documents he provided.

Numerous arguments have been made by both parties regarding why the evidence seized should or should not be suppressed. Ultimately, the Court can decide the motion by analyzing three issues: (1) whether the government waived its ability to challenge Bradford's standing to bring this motion; (2) whether Bradford has standing to challenge the search of LLB; and (3) whether the omissions from the affidavit are material. The Court finds that the government did not waive its ability to challenge Bradford's standing, that Bradford has standing to challenge the search of some areas within LLB, and that the omissions from the search warrant were not material. Accordingly, the Court recommends that Bradford's motion to suppress be denied.

In support of this recommendation, the Court provides its findings of facts, the relevant law, and its analysis.

## II.    Factual Findings

### A.    Background

In 2015, several agencies began investigating Bradford. ECF No. 117 at 20-21, 22.[1] Generally, the investigation involved two sets of allegations: (1) a kickback scheme related to a contract at the Hoover Dam (*id.* at 21) and (2) tax evasion (*id.* at 22-23). The superseding indictment in this case only charges Bradford with tax-related crimes. ECF No. 33. Accordingly, the motion to suppress and this Report and Recommendation only deals with suppressing tax-related evidence. *See* ECF No. 83 at 2, n.3.

---

[1] All citations to page numbers refer to CM/ECF's page numbers.

### B.    Facts Related to Materiality

A search warrant, including an affidavit in support, was submitted to a United States Magistrate Judge in the District of Nevada in February 2016. Government's Ex. 1. The affidavit provided the following information.[2]

#### i.    Bradford is a Principal at LLB and Owns and Controls Sere

Bradford is a Certified Public Accountant, founder, and principal partner of LLB. Government's Ex. 1 at 24. LLB is a mid-size accounting firm in Las Vegas. *Id.* LLB provides several services, including auditing, consulting, accounting, and tax preparation. *Id.*

Bradford also owns and manages Stable Development, LLC (Stable). *Id.* at 25. Stable is the officer and manager of Sere Holdings, LLC (Sere). *Id.* Critically, Bradford owns and controls Sere through Stable. *Id.*

#### ii.    The Government First Learns of Bradford's Alleged Tax Scheme

Evidence gathered in officers' investigation (as explained in more detail below) supported the notion that Bradford may have been involved in a tax scheme. *Id.* Under the scheme, Bradford sold losses from Sere to other companies so the purchaser of the loss could deduct the loss on their federal tax return. *See id.* The scheme was fraudulent because taxpayers may only deduct losses that they actually incurred; they cannot purchase losses from another company that they did not realize. *Id.*

The government first became aware of Bradford's alleged tax scheme through Susan Herring. *See id.* at 26. Herring was a former employee of LLB. *Id.* In May 2015, she told the IRS-CI[3] that a former co-worker, Dean Walker, informed her that LLB engaged in tax evasion. *Id.*

After speaking with Herring, Walker also talked to the IRS-CI. *Id.* In June 2015, Walker met with the IRS-CI but was reluctant to provide information for fear of losing his job. *Id.* On July 6, 2015, Walker resigned from LLB. *Id.*

---

[2] To determine whether the omitted information about Ip is material to the probable cause determination under *Franks v. Delaware*, 438 U.S. 154 (1978), the Court only considers the information in the affidavit and the alleged omissions. *See United States v. Meling*, 47 F.3d 1546, 1554 (9th Cir. 1995) (court must consider whether the affidavit supporting probable cause, "once corrected and supplemented, would provide a [reviewing judge] with a substantial basis for concluding that probable cause existed").

[3] "IRS-CI" refers to Internal Revenue Service, Criminal Investigation, which is a federal investigatory agency. *Id.* at 16-17.

### iii.    Henry Ip Provides the Government with the Ip Drive

Sometime thereafter, another employee, Henry Ip, also resigned from LLB. *Id.* On July 27, 2015, Ip met with the IRS-CI but was similarly reluctant to provide information. *Id.* At the end of the meeting, however, Ip advised that he had documents from LLB on a thumb drive that he had maintained while working at LLB. *Id.* Ip said he would make the documents available to the IRS-CI. *Id.* Ip gave the drive to the IRS-CI the next day. *Id.*

### iv.    Walker Explains Bradford's Alleged Tax Scheme to the Government, and Other Information Corroborates His Story

In October 2015, the FBI and IRS-CI interviewed Walker again. *Id.* at 27. In that meeting, Walker provided the following information: One of Bradford's companies, Sere, had accumulated a large amount of depreciation deductions. *Id.* Bradford and other partners in Sere legally claimed as much of depreciation deductions as was allowed under the tax code. *Id.* However, Sere's losses were so great that there was excess depreciation that could not be legally claimed by Sere. *Id.* As a result, Bradford approached several of his clients and offered to sell them the excess depreciation, which would lower their tax liabilities. *Id.* Multiple clients agreed to purchase Sere's excess depreciation for tax years 2012, 2013, and 2014. *Id.* The clients claimed the depreciation on their tax returns in one of two ways. *Id.* The first way was to claim the depreciation as a "cost of goods." *Id.* The second involved Bradford issuing K-1 losses to his clients so they could claim the loss on their tax returns. *Id.* Walker explained the tax scheme was fraudulent because the clients who participated were not partners in Sere when the depreciation was incurred and, therefore, were not entitled to claim Sere's depreciation. *Id.*

Based on the affiant's training and experience and information provided to him by the IRS-CI, he knew Bradford's deduction scheme was fraudulent. *Id.* at 28. Depreciation cannot legally be sold to another entity. *Id.* Such deductions can only be taken by the individual or entity who owns part or all of the entity in question. *See id.*

Walker also told investigators that after he learned of Bradford's tax scheme, he reviewed LLB client files. *Id.* He identified 11 to 12 clients that were involved in the scheme. *Id.* He

provided three examples, including Rockstar Inc. (Rockstar), Michael Stuart (Stuart), and APan, LLC (APan). *Id.*

### a.    Rockstar

After learning of the depreciation scheme, Walker spoke with Rockstar's CFO (who was also a CPA at LLB), Mark Borgan. *Id.* Borgan said he had spoken to Rockstar's part owner, Jeannette Weiner, regarding Rockstar's 2012 tax return. *Id.* Weiner revealed she paid Bradford a large sum of money in exchange for a $2.5 million tax deduction related to the depreciation scheme. *Id.* Bradford advised Weiner that the depreciation could be taken as a deduction for cost of goods sold. *Id.*

After interviewing Walker, the IRS-CI searched the Ip drive for information related to Rockstar. *Id.* at 29. This search revealed flowcharts illustrating the depreciation and deduction scheme. *Id.* An example of one such flowchart is included in the affidavit, which depicts Rockstar investing $795,234 in Sere for a $5,301,562 depreciation/K-1 loss for federal and state taxes. *Id.*

A federal grand jury subpoena was served on Sere's bank account during the investigation. *Id.* Documents returned pursuant to this subpoena showed a $795,234 wire transfer from Rockstar to Sere on February 21, 2013, corresponding with the amount depicted in the flowchart on the Ip drive. *See id.* at 29-30.

An agent reviewed Rockstar's tax returns for 2012, 2013, and 2014. *Id.* at 30. He concluded that it was unclear if Rockstar's returns included the fraudulent depreciation deductions. *Id.*

As a partnership, Sere is required to complete a Form 1065 each year. *Id.* at 32-33. One of the purposes of this form is to prevent tax fraud by requiring partnerships to report their partners and the percentage of ownership each partner holds. *Id.* This is important because partners are only allowed to make claims on their tax returns (such as gains, losses, and depreciation) based on their percentage of ownership. *Id.* at 33. A common indicator of tax fraud is a person or entity claiming a loss or depreciation from a partnership but not being listed on the partnership's Form 1065. *Id.*

Rockstar was not listed as a partner on Sere's Form 1065 filing with the IRS. *Id.* at 33, 34.

### b.    Stuart

According to Walker, Stuart was another client that participated in the fraudulent deduction scheme. *Id.* at 30. Walker stated that on Stuart's 2013 tax return, he took a $600,000 deduction related to Sere's depreciations. *Id.*

The IRS-CI searched the Ip drive for documents related to Stuart. *Id.* It discovered a 2013 Form 1040 for Stuart, which included a $502,513 K-1 loss from Sere and listed Sere as one of Stuart's partnerships. *See id.* However, according to Sere's 2013 Form 1065 filed with the IRS, Stuart is not a partner in Sere. *Id.* at 30, 33, 34.

The Ip drive also contained an email dated October 8, 2013 from Stuart to Bradford and another tax preparer at LLB. *Id.* at 30. The email stated that Stuart put $101,000 into Sere. *Id.* at 30-31. Documents returned pursuant to a federal grand jury subpoena to Sere's bank showed Stuart paid Sere $101,000 via check on October 3, 2013. *Id.* at 31. This amount corresponded with the amount detailed in the email on the Ip drive. *See id.* Additionally, this payment and the K-1 loss from Sere on Stuart's Form 1040 suggest Stuart fraudulently purchased its loss from Sere to reduce his tax liability. *Id.*

### c.    APan

Walker stated that APan participated in Bradford's fraudulent tax scheme and took a $760,000 deduction listed as "cost of sales." *Id.* APan's owner and a tax preparer at LLB told Walker that Bradford stated APan would have a large tax deduction on its tax return, and it should be "just enough to cover the income." *Id.*

The IRS-CI searched the Ip drive for documents relating to APan. *Id.* The Ip drive had a flowchart for tax year 2012 between APan and Sere. *Id.* The Ip drive also contained APan's tax return and tax papers for 2013. *Id.* In 2013, APan claimed $751,012 in cost of goods sold. *Id.* In the tax paperwork for APan, a document showed two columns. *Id.* at 31-32. One column was labeled "tax" and highlighted green. *Id.* at 32. The other column was labeled "After Sere Adjustment" and highlighted yellow. *Id.* Also highlighted yellow was a cell showing $751,012 for cost of goods sold. *Id.* The "After Sere Adjustment" changed APan's net income from $741,581.87 to a net loss of $9,430.13. *Id.*

APan was not listed as a partner on Sere's official 1065 filing with the IRS. *Id.* at 33, 34.

### d.    Other Clients

Walker advised there were approximately eight or nine other clients involved in Bradford's depreciation scheme. *Id.* at 32.

The IRS-CI searched the Ip drive for additional clients that participated in the scheme. *Id.* The Ip drive contained seven additional client folders that contained flowcharts and/or membership purchase agreements between LLB clients and Sere. *Id.*

On October 8, 2015, Walker revealed that he had a portable hard drive containing many LLB client files. *Id.* at 45-46. Walker stated that before leaving LLB, he copied these files. *Id.* at 46. Walker produced the hard drive to the government pursuant to a grand jury subpoena in November 2015. *Id.* Agents subsequently searched the hard drive per a search warrant. *Id.* The hard drive contained LLB documents showing payments made to Sere by LLB clients. *Id.* These LLB clients were not listed on Sere's Form 1065 filings with the IRS as partners in Sere. *Id.* These documents suggested that seven LLB clients (named in the affidavit) were also involved in Bradford's depreciation scheme, including Moonshell, LLC. *Id.* at 46-47.

The IRS-CI reviewed Sere's bank records returned pursuant to the grand jury subpoena. *Id.* at 47. These records revealed that, in addition to Stuart and Rockstar, Sere received payments from four other individuals and entities not identified as Sere's partners on its IRS filings, including Moonshell, LLC. *Id.* No evidence in the investigation suggested that these payments were for anything other than the purchase of depreciation in connection with Bradford's fraudulent tax scheme. *Id.*

### e.    Recorded Conversation Between Walker and Bradford

On October 20, 2015, an in-person meeting took place between Walker and Bradford. *Id.* at 36. Walker recorded the meeting at the direction of the FBI without Bradford's knowledge. *Id.* During the meeting, Walker confronted Bradford about the depreciation scheme and specifically Rockstar, Stuart, and APan. *Id.* Bradford explained that the clients took a deduction and that Rockstar, Stuart, and APan were involved in a profit-sharing arrangement. *Id.* at 36-37. Bradford stated that if the IRS disagreed with this arrangement, the clients would have to adjust their tax

1  returns and he would get his losses back. *Id.* at 37. Bradford then explained that some of the

2  clients were not actually in an ownership agreement, but it was a way to raise capital. *Id.*

3  Based on the affiant's training and experience and consultations with FBI and IRS-CI,

4  selling losses to a client as part of a profit-sharing arrangement is not a generally accepted

5  accounting practice, nor does it justify the deductions claimed by the clients on their tax returns.

6  *Id.* It is the IRS-CI's position that such a practice is fraudulent and illegal. *Id.*

7  **C.    The Magistrate Judge Issues the Search Warrant for LLB**

8  Based on the information contained in the affidavit, the magistrate judge authorized the

9  search warrant of LLB. Government's Ex. 1 at 55. LLB was subsequently searched, and evidence

10  was seized. ECF No. 129 at 85.

11  **D.    Facts Related to Standing**

12  At the time the search warrant was executed, LLB was owned by Bradford's wife's

13  property trust (Leilani Bradford Separate Property Trust), Dustin Lewis, and Mike Harman. ECF

14  No. 129 at 120-21. Bradford did not own any part of LLB. *See* Ex. P.

15  LLB's operating agreement stated that Bradford shall "have the authority to manage the

16  day-to-day operation of the business . . . ." *Id.* at 8.

17  As a non-owner of the business, Bradford acted as a non-member manager.[4] ECF No. 129

18  at 122. He did "executive management" for the firm, sourced clients, raised capital funding, and

19  provided guidance to the partners. *Id.* at 122, 123-24, 125. His involvement was "higher level,"

20  and he was not involved much with employees or the work of completing tax returns, financials,

21  audits, and the like. *Id.* at 124-25. Other managers in the firm completed this work. *Id.*

22  Bradford signed the lease for LLB's offices. *Id.* at 125. Bradford owned (at least part) of

23  the company that leased LLB its office space. *Id.*

24  At the time the search warrant was executed, LLB employed at least 49 people.[5] ECF No.

25  129 at 65.

26

27

28

---

[4] The operating agreement did not list Bradford as a non-member manager but instead confusingly called him a member-manager (though he owned no part of the business). ECF No. 129 at 128-130. However, these distinctions are not material to the Court's analysis.
[5] The firm administrator, Tenille Lapito, testified that 49 people worked at LLB in February 2016 based on looking at health insurance information for the company. ECF No. 129 at 63, 65, 66. Part-time employees who did not have

1    When the search warrant was executed, LLB's entire office was searched, including all

2    the offices, the common spaces, and the server room. *Id.* at 85, 86.

3    Bradford's personal office was searched, and items were seized from it. *See id.* at 85.

4    Items were also taken from Lapito's office, the firm administrator. *Id.* Lapito had her own

5    office that Bradford could come and go from as he pleased. *Id.* at 69.

6    Lapito had filing cabinets in her office. *Id.* She had a main cabinet (which she also

7    referred to as the lower cabinet) behind her desk that she always locked at night and unlocked

8    when she returned to work. *Id.* at 70. She had keys to this cabinet, and Bradford could have

9    access to those keys too. *Id.* at 70-71, 87. She kept original corporate documents in this cabinet

10   (e.g., operating agreements, membership purchase agreements, investor documents, etc.). *Id.* at

11   71. She kept these documents on behalf of Bradford. *Id.*

12   Lapito also had file drawers that she did not typically lock and a filing cabinet "on top"

13   that she never locked. *Id.* at 70. Some documents she kept unlocked included financial

14   documents, tax records, investor documents, etc. *Id.* at 71-72.

15   On the day the search warrant was executed, Lapito had a brown bag of binders in her

16   office that Bradford had brought her. *Id.* at 72. These binders contained various documents,

17   including tax and financial documents, that Bradford was putting together to give to the

18   government. *Id.* These documents related to the "data breach." *Id.* at 115-16.

19   Lapito also had three or four large four-drawer lateral cabinets that were behind an orange

20   wall by LLB's copiers. *Id.* at 73. She kept these filing cabinets locked. *Id.* at 73, 74. Here, she

21   kept financial documents, tax documents, personal documents, agreements, investor documents,

22   and "pretty much anything that we needed to keep [a] hardcopy file for." *Id.* at 73.

23   All users at LLB had unique usernames and passwords to log onto their computers. *Id.* at

24   74.

25

26   insurance would not be included in this number. *Id.* at 91. As a result, the government introduced a summary of tax records to show that LLB had more than 49 employees in 2016. *Id.* at 141-42 (LLB employed 67 employees in 2013,

27   76 employees in 2014, and for the first two quarters of 2015, 65 employees). However, the government did not have any information from the IRS to tell how many employees were employed by LLB in 2016 when the warrant was

28   executed. *Id.* at 143. In sum, and as stated above, the evidence suggests that LLB employed a minimum of 49 employees when the warrant was executed and possibly more.

1    The servers at LLB were inside a locked room. *Id.* at 75.

2    Everyone at LLB had access to two public drives on the server. *Id.* at 77. Employees also

3    had access to their own user drive (called a "U drive") that was restricted so each employee could

4    only access their own U drive. *Id.*

5    Lapito saved some of Bradford's personal documents on her U drive. *Id.* at 80.

6    The server also contained other restricted drives. *Id.* at 77. One such restricted drive was

7    called the PERM drive, which included a folder called "The Vault." *Id.* at 79. The Vault

8    contained corporate documents. *Id.* Lapito also saved some of Bradford's personal documents in

9    the Vault, including estate planning documents and his passport. *Id.* Bradford, his wife, Lapito,

10    Aaron Dean, and Cedric Tillman all had access to the Vault. *Id.*

11    Bradford had full access to LLB's office, including its servers. *Id.* at 81, 84, 114.

**III.    Analysis**

13    As noted above, while several issues were presented by the parties, the Court need only

14    address three to decide the motion: (1) whether the government waived its ability to challenge

15    Bradford's standing to bring this motion; (2) whether Bradford has standing to bring this motion;

16    and (3) whether Bradford established a *Franks* violation. The Court will address each in turn.

**A.    Whether the Government Waived Its Argument that Bradford Lacks Standing to Bring this Motion**

19    When Bradford originally filed his motion to suppress, he did not address the issue of

20    standing. ECF No. 87. The government addressed the issue in its response by way of a footnote,

21    stating, "The government obviously does not waive any arguments regarding Bradford's lack of

22    standing to challenge the search of LLB's files since he had no ownership interest in the firm or

23    its files." ECF No. 88 at 17, n.7 (citing *United States v. SDI Future Health, Inc.*, 568 F.3d 684

24    (9th Cir. 2009)). Bradford then argued in his reply (also in a footnote) that the government

25    waived its ability to challenge Bradford's standing, as its argument was undeveloped. ECF No. 89

26    at 4, n.5. Bradford maintains that the government waived any standing arguments by only

27    including a one-line argument in its response brief. ECF No. 133 at 55. The government

28    disagrees, relying on two briefs it previously filed. ECF No. 137 at 63 (citing ECF Nos. 96, 112).

1          The Ninth Circuit has held that when an issue is placed in the record and the district court

2   has an opportunity to consider and decide the issue, it is not waived for purposes of appeal. *See,*

3   *e.g.*, *United States v. Scott*, 705 F.3d 410, 415-416 (9th Cir. 2012) ("Raising a theory to the

4   magistrate judge 'during the evidentiary hearing on the motion to suppress' preserves that theory

5   for appeal."); *United States v. Gourley*, 267 F. App'x 656, 657 (9th Cir. 2008) ("Gourley did not

6   waive his appeal regarding the seizure of the vehicle by failing to challenge the seizure in the

7   district court until his motion to reconsider. That motion gave the district court and the

8   government the opportunity to address this issue fully.").

9          Here, the Court finds that the government did not waive its ability to challenge Bradford's

10  standing to bring this motion. The government raised Bradford's potential lack of standing in its

11  original response brief (albeit in a cursory manner). ECF No. 88 at 17, n.7. This put Bradford on

12  notice (to the extent he was not already) that he would need to establish his standing to bring this

13  motion, and the government cited the controlling Ninth Circuit case under which it was

14  challenging Bradford's standing. *Id.* Bradford then put on extensive evidence to establish his

15  standing. ECF No. 129 at 65-143. Additionally, the Court allowed both parties to fully address

16  the issue of standing in their post-hearing briefs, which they did. ECF No. 129 at 178 (stating, "I

17  know that there was a standing issue that needed to be addressed as well. So go ahead and address

18  the standing issue, and also refer to any kind of evidence that you want me to look at based on the

19  hearings that we've had."); ECF No. 133 at 50-54; ECF No. 137 at 41-56; ECF No. 139 at 26-30;

20  LR 7-2(g) (court may grant leave to file supplemental briefing); *Sorrell v. Swarthout*, No. C 09-

21  05888 SI, 2011 WL 3473365, at *5, n.1 (N.D. Cal. Aug. 9, 2011) (courts have broad discretion to

22  consider supplemental briefing). Accordingly, the government sufficiently raised the issue so the

23  Court could consider and decide it. As mentioned above, the issue is preserved for appeal. *See*

24  *Scott*, 705 F.3d at 415-416. It would thus make little sense for this Court not to decide the issue

25  and leave it for the Ninth Circuit to decide in the first instance (which may require remanding the

26  issue back to this Court). Accordingly, the government did not waive its right to challenge

27  Bradford's standing.

28

**B.      Whether Bradford Has Standing to Bring this Motion**

Defendants who assert a Fourth Amendment challenge bear the burden of establishing standing. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995).

To have standing to assert a Fourth Amendment violation, a person must assert that *his* Fourth Amendment rights have been violated. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009). A person's Fourth Amendment rights can only be violated if the person has "a legitimate expectation of privacy in the invaded place . . . ." *Id.* at 695. This means that the person must have both a subjective expectation of privacy in the searched area and his expectation must be objectively reasonable. *Id.* In the context of a workplace, reasonable expectations of privacy vary and must be analyzed on a case-by-case basis. *Id.*

The Ninth Circuit has provided three ways in which a defendant can establish standing to challenge a search at his workplace. The Court will discuss each in turn.

**i.      A Defendant Has Standing to Challenge the Search of His Personal Office**

First, Bradford argues that he has standing to challenge the search of his personal office. ECF No. 133 at 53.

A defendant has standing to challenge the search of his personal office. *SDI*, 568 F.3d at 694, 698.

Here, Bradford's personal office was searched, and items were seized from it. ECF No. 129 at 85. Accordingly, Bradford has standing to challenge the search of his office. *SDI*, 568 F.3d at 694, 698.

1

2

> **ii.**    **A Defendant Has Standing to Challenge Areas Beyond His Office If the Workplace Is a Small Business Over Which He Exercises Daily Management and Control**

3

4

Second, Bradford argues that he has standing to challenge the entire search of LLB. ECF No. 133 at 52-53.

5

6

A defendant has standing to challenge areas beyond his personal office if the workplace in question is "a small business over which [he] exercises daily management and control." *See SDI*,

7

568 F.3d at 698. Two cases provide instruction on how the Ninth Circuit applies this small

8

business test.

9

In *United States v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005), *amended on denial of*

10

*reh'g,* 437 F.3d 854 (9th Cir. 2006), the Ninth Circuit held that two individual defendants had

11

standing to challenge the search of their workplace. In reaching this conclusion, the court noted

12

that the office was "a small, family-run business housing only 25 employees at its peak. In such

13

an office, individuals who own and manage the business operation have a reasonable expectation

14

of privacy over the on-site business . . . ." *Id.* at 1116-17. The court further specified that because

15

the defendants "exercised full access to the building as well as managerial control over its day-to-

16

day operations, they had a reasonable expectation of privacy" in the premises. *Id.* at 1117.

17

In *United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009), the Ninth

18

Circuit further explained when a business employee has standing to challenge the search of his

19

workplace. The court first noted that simply being an employee, a manager, or a shareholder is

20

not sufficient to establish standing. *Id.* at 696. The court went on to explain that what was critical

21

to its finding of standing in *Gonzalez* was the "close control that the owner-operators exercised

22

over their small business," which just so "happened to be family-run." *Id.* The court went on to

23

distinguish *SDI* from *Gonzalez*. The Court noted (1) that SDI's office was twice the size of the

24

office at issue in *Gonzalez* and (2) that while the individual defendants in *SDI* exercised some

25

managerial control, they did not personally manage the "operation of the office on a daily basis,

26

only that they set its general policy as officers of SDI. Because [they] personally exercised less

27

28

1    control over the premises in question than did the defendants in *Gonzalez*," they could not

2    establish standing based on the so-called small business test used in *Gonzalez*. *Id.* at 697.

3             Here, the facts of Bradford's case are similar to *SDI*, and the Court finds that he cannot

4    satisfy the small business test laid out in *Gonzalez* to establish standing to challenge the search of

5    LLB's entire office. As an initial matter, though not dispositive, Bradford did not own any portion

6    of LLB when the search warrant was executed. LLB was owned by Bradford's wife's property

7    trust (Leilani Bradford Separate Property Trust), Dustin Lewis, and Mike Harman. ECF No. 129

8    at 120-21. Additionally, like in *SDI*, LLB was nearly (if not greater than) twice the size of the

9    office in *Gonzalez*. At the time the search warrant was executed, LLB employed at least 49

10   people (as opposed to *Gonzalez's* 25 employees). ECF No. 129 at 65. Finally, and most

11   importantly, the Court finds that Bradford did not not personally manage the operation of LLB's

12   office on a daily basis. Bradford did "executive management" for the firm, sourced clients, raised

13   capital funding, and provided guidance to the partners. *Id.* at 122, 123-24, 125. His involvement

14   was "higher level," and he was not involved much with employees or the work of completing tax

15   returns, financials, audits, and the like. *Id.* at 124-25. Other managers in the firm completed this

16   work. *Id.* While he had the authority to manage the day-to-day operations of the office if he chose

17   (Ex. P. at 8), the Court does not find that he *actually* managed the day-to-day operations of the

18   office. His own wife's testimony (which the Court found to be credible) suggests that, like in *SDI*,

19   Bradford was more of a "policy-maker:" he was responsible for "higher level" decisions

20   regarding clients, funding, and the direction of the firm. ECF No. 129 at 122, 124-125; *SDI*, 568

21   F.3d at 697 ("[T]he magistrate judge's findings do not show that [the defendants] personally

22   managed the operation of the office on a daily basis, only that they set its general policy as

23   officers of SDI. Because [the defendants] personally exercised less control over the premises in

24   question than did the defendants in *Gonzalez,* that precedent does not control here.").

25   Accordingly, the Court finds that Bradford cannot establish standing under *Gonzalez's* small

26   business test to challenge the entire search of LLB.

27

28

### iii.    A Defendant Has Standing to Challenge Areas Beyond His Office If He Can Show a Personal Connection to the Places Searched and Items Seized

Third, Bradford argues that he has standing to challenge the search of several specific areas in LLB, as discussed in more detail below. ECF No. 133 at 54; ECF No. 139 at 29-30.

A defendant has standing to challenge areas beyond his personal office if he can "show some personal connection to the places searched and the materials seized." *SDI*, 568 F.3d at 698. In making this determination, courts are to analyze the following three factors:

> (1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization.

*Id.*

Here, Bradford argues that under this test, he has standing to challenge the search of (1) his computer, (2) Lapito's office, (3) Lapito's filing cabinets containing personal items of Bradford's and his wife's, and (4) LLB server files containing Bradford's personal and private files. ECF No. 133 at 54; ECF No. 139 at 29. The Court will address each in turn.

First, Bradford has standing to challenge the search of his computer. Bradford had a computer in his private office (ECF No. 129 at 82), and the Court already found he had standing to challenge the search of his personal office.

Second, Bradford does not have standing to challenge the search of Lapito's office. The Ninth Circuit has explained that "it is crucial to Fourth Amendment standing that the place searched be given over to the defendant's exclusive use. We have thus held that mere access to, and even use of, the office of a co-worker does not lead us to find an objectively reasonable expectation of privacy." *SDI*, 568 F.3d at 695–96 (cleaned up). Here, Lapito's office was not given over to Bradford's exclusive use; it was her office. ECF No. 129 at 69. While Bradford had access to Lapito's office and could come and go from it as he pleased (*id.*), "this does not lead us to find an objectively reasonable expectation of privacy." *SDI,* 568 F.3d at 696. Accordingly, Bradford does not have standing to challenge the search of Lapito's office.

Third, Bradford has standing to challenge the seizure of any personal items of his from Lapito's cabinets. *See Id.* at 698 (a defendant has standing to challenge areas beyond his personal office if he can show that the item seized is personal property).

Bradford does not have standing, however, to challenge the entire search of Lapito's cabinets (for items seized other than his personal property). In determining whether Bradford has standing to challenge the search of Lapito's cabinets generally, the Court must consider: (1) whether the item seized was kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization. *SDI*, 568 F.3d at 698. Regarding the first factor, there is no evidence that items seized from Lapito's cabinets were kept separate from other work-related material.[6] *See* ECF No. 129 at 70-74. Regarding the second factor, there was no evidence that Bradford had custody or immediate control of any items when agents seized them, nor does Bradford argue this. ECF No. 133 at 54; ECF No. 139 at 29-30. Finally, regarding the third factor, there was no evidence offered that *Bradford* took precautions on his own behalf to secure the place searched or things seized from interference without his authorization. *Lapito* took steps to lock some cabinets sometimes, but there was no evidence that Bradford similarly locked cabinets or directed Lapito to do so. *See* ECF No. 129 at 70, 73, 74.

Fourth, Bradford has standing to challenge the seizure any personal files contained on the LLB server. *See SDI*, 568 F.3d at 698 (a defendant has standing to challenge areas beyond his personal office if he can show that the item seized is personal property).

Bradford does not, however, have standing to challenge the search of the LLB servers generally (for items seized other than his personal property). In determining whether Bradford has

---

[6] Instead, Lapito testified to keeping work-related documents in all her filing cabinets. ECF No. 129 at 70, 71 (in her main cabinet, she kept original corporate documents); at 70-72 (in her other file drawers and top filing cabinet, she kept financial documents, tax records, investor documents, etc.); at 73 (in cabinets by an orange wall, she kept financial documents, tax documents, personal documents, agreements, investor documents, and "pretty much anything that we needed to keep [a] hardcopy file for."). Thus, to the extent personal items were kept in these cabinets, the evidence did not establish that they were kept separate from work-related materials (and indeed appear to have been kept with work materials). To the extent Bradford may argue that all the corporate, tax, financial, etc. documents Lapito testified about were personal to Bradford, this was not established in her testimony.

standing to challenge the search of LLB's servers generally, the Court must consider: (1) whether the item seized was kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization. *SDI*, 568 F.3d at 698. No evidence was offered that items seized were kept in a private place on the server separate from work-related materials, nor does Bradford flesh out any argument to this effect. *See* ECF No. 133 at 54; ECF No. 139 at 29-30. No evidence was offered that Bradford had custody or immediate control of documents on the server when officers seized them. And no evidence was offered that *Bradford* took precautions on his own behalf to secure the servers or documents on the servers from interference without Bradford's authorization. Bradford argues only that files on the LLB server "were password protected and accessible only to the Bradfords and, in some cases, to close associates at the Bradford's discretion." ECF No. 133 at 54. However, there was no evidence that *Bradford* himself set up such protections. Additionally, the fact that *LLB* required all employees to have usernames and passwords for their computers (ECF No. 129 at 74) and locked their server room (*id.* at 75) does nothing to help *Bradford* establish standing. "The security measures that [a business] t[akes] to ensure the privacy of its business records are relevant only to the standing of the corporation itself, not of its officers." *SDI,* 568 F.3d at 698. Accordingly, Bradford has not established standing to challenge the search of LLB's servers (except to the extent his personal, non-LLB property was seized).

### C.    Whether Bradford Proved a *Franks* Violation

Bradford argues that the warrant in this case was defective under *Franks v. Delaware*, 438 U.S. 154 (1978) because the government recklessly or intentionally omitted information about Ip's credibility from the affidavit. ECF No. 133 at 44. Had this information been included, according to Bradford, the affidavit would not have established probable cause to search LLB.

*See id.* As explained below, the Court finds that probable cause still would have existed even if this information had been included.[7] Accordingly, no *Franks* violation occurred.

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

"Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006); *see United States v. SDI Future Health, Inc.*, 568 F.3d 684, 703 (9th Cir. 2009) (providing same rule).

The defendant bears the burden to show that a warrant was defective. *Chin Kay v. United States*, 311 F.2d 317, 321 (9th Cir. 1962); *United States v. Washington*, No. CR S-11-00345 KJM, 2012 WL 3638227, at *6 (E.D. Cal. Aug. 22, 2012) ("When the results of a warrant-based search are challenged in a motion to suppress, the defendant bears the burden of demonstrating that the search is unreasonable under the Fourth Amendment."). One way a defendant can show that a warrant is defective is by showing that it lacked probable cause due to a *Franks* violation.

In *Franks*, the United States Supreme Court held that a defendant could challenge a warrant affidavit by showing that (1) the affiant recklessly or intentionally included false statements in the affidavit and (2) the false statements were necessary to finding probable cause. 438 U.S. at 155–56.

Importantly for this case, the Ninth Circuit extended *Franks* to cover situations in which the affiant intentionally or recklessly omitted material facts from the affidavit. *United States v. Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995) ("*Franks* applies to omissions as well as false statements."); *United States v. Stanert*, 762 F.2d 775, 780-81 (9th Cir. 1985), *amended,* 769 F.2d

---

[7] As such, the Court need not reach whether the government recklessly or intentionally omitted information from the affidavit.

1410 (9th Cir. 1985). In other words, a *Franks* violation can also be established when the

defendant proves that (1) the affiant recklessly or intentionally omitted facts from the affidavit

and (2) had the omitted facts been included, they would have destroyed probable cause. *Id.*; *see*

*United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) ("To prevail on a *Franks* challenge,

the defendant must establish two things by a preponderance of the evidence: first, that 'the affiant

officer intentionally or recklessly made false or misleading statements or omissions in support of

the warrant[,]' and second, that the false or misleading statement or omission was material, *i.e.*,

'necessary to finding probable cause.'").

The question the court must ask to determine if the omitted information is material or

necessary to the probable cause determination is whether probable cause remains after the omitted

information is included. *Perkins*, 850 F.3d at 1119 ("The key inquiry is 'whether probable cause

remains once the evidence presented to the magistrate judge is supplemented with the challenged

omissions.'"); *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014) ("The question we must

decide is 'whether probable cause remains once the [evidence presented to the magistrate judge]

is supplemented with the challenged omission[s].'").

Here, Bradford argues that the government omitted from the affidavit the fact that Ip

obtained at least some of the documents on the Ip drive illegally (by hacking into LLB's servers).

ECF No. 133 at 44, 46, 48. Bradford argues that this information calls into question Ip's

credibility and the trustworthiness or authenticity of the documents he provided to the

government. *Id.* More specifically, Bradford's argument goes like this: if Ip hacked into LLB's

systems, stole documents, committed a crime with this conduct, and lied to the government by

telling it that he maintained the documents on the Ip drive while working at LLB (versus stealing

them after he left), then Ip is not worthy of belief. *See id.* at 46. More specifically, Ip's implicit

assertion that the Ip drive contained *authentic* LLB documents is not worthy of belief. *See id.* at

44, 48. And if this statement is not worthy of belief, then the issuing judge could not have relied

on the documents from the Ip drive when determining if probable cause existed. *See id.* at 49-50.

Finally, Bradford concludes that the affidavit did not support a probable cause finding without the

Ip documents. *Id.* at 50.

Here, the Court finds that had the omitted information been included in the affidavit, probable cause would still have existed. That is, even if agents included that Ip hacked into LLB's systems, stole documents, committed a federal crime with this conduct, and lied to the government by telling it that he maintained the documents on the Ip drive while working at LLB, probable cause would have still existed to issue the search warrant.[8] [9]

> **i.    If the Omitted Information Was Included, the Magistrate Judge Would Still Find Ip's Implicit Assertion that the Ip Drive Contained Authentic Documents Credible**

Including the omitted information in the affidavit would not have led to the conclusion that Ip was not credible and, more to the point, that the documents on the Ip drive were not authentic. If the government had included the alleged omissions (in their most extreme form)—Ip committed a federal crime by hacking into LLB's servers and stealing documents he included on the Ip drive, and he lied to the government about how he obtained these documents (saying he maintained them while working at LLB)—this would not lead the issuing judge to believe that his "statement" was untrustworthy. (His implicit statement being that he provided authentic LLB documents to the government on the Ip drive.) This is so because the documents on the Ip drive were corroborated by Walker's statements,[10] Sere's bank records, Bradford's statements in his recorded conversation with Walker, and Walker's hard drive. *See Illinois v. Gates*, 462 U.S. 213, 244–45 (1983) ("It is enough, for purposes of assessing probable cause, that 'corroboration

---

[8] The Court makes no finding as to whether Ip hacked into LLB's systems, stole documents, committed a federal crime with this conduct, and/or lied to the government by telling it that he maintained the documents on the Ip drive while working at LLB. The Court is merely stating that even if it found all these facts to be true, probable cause would still exist.

[9] Bradford requested that the Court draw an adverse inference that had Ip testified (instead of invoking the Fifth Amendment), he would have testified that he hacked into LLB's servers. ECF No. 133 at 56. The Court need not reach this argument because the Court assumes (without deciding) that Ip hacked into LLB's servers. Similarly, Bradford requested that the government be forced to immunize Ip so he could testify without fear of prosecution. *Id.* at 58-59. The Court need not reach this argument because, again, the Court assumes for purposes of its analysis that Ip would have testified consistent with Bradford's position (i.e., that he hacked into LLB's system, stole documents, committed a crime with this conduct, and lied to the government about maintaining the documents on the Ip drive while he worked at LLB).

[10] Bradford baldly asserts that Walker's statements are not credible because of his bias against Bradford and his desire to steal clients. ECF No. 133 at 48. However, Bradford cites nothing in support of this assertion. *See id.* To the extent Bradford suggests that the magistrate judge could not rely on Walker's statements, Bradford has not fleshed out this argument, and the Court rejects it. Further, the Court notes that Sere's bank records, Sere's Form 1065 filings, and Walker's recorded conversation with Bradford all corroborate Walker's statements to the government and suggest that his statements were credible.

through other sources of information reduced the chances of a reckless or prevaricating tale,' thus

providing 'a substantial basis'" for crediting the informant); *United States v. Meling*, 47 F.3d

1546, 1555 (9th Cir. 1995) (some evidence suggested the informant was credible, including the

fact that the government was able to verify that a conversation he described occurred); *United*

*States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) (the reliability of information

provided by an informant may be demonstrated through independent police corroboration of the

information provided). Accordingly, as discussed below, even if the alleged omissions were

included in the affidavit, the magistrate judge still would have concluded that Ip's documents

were authentic because they were independently corroborated by multiple sources.[11]

The affidavit relied on the following information from the Ip drive, all of which was

corroborated by other sources.

First, the affidavit relied on a flowchart from the Ip drive illustrating the depreciation and

deduction scheme for Rockstar. Government's Ex. 1 at 29. This flow chart depicts Rockstar

investing $795,234 in Sere for a $5,301,562 depreciation/K-1 loss for federal and state taxes. *Id.*

Sere's bank records corroborate this flowchart. Documents returned pursuant to a federal grand

jury subpoena showed a $795,234 wire transfer from Rockstar to Sere on February 21, 2013. *See*

*id.* at 29-30. Walker's statements that Rockstar participated in the tax scheme and paid a large

amount for a deduction also suggests that the flowchart on the Ip drive was authentic. *See id.* at

28. Finally, Sere's Form 1065 filing with the IRS, showing that Rockstar was not a partner of

Sere's, also suggests that the flowchart authentically depicts Rockstar's involvement in a

fraudulent tax scheme. *See id.* at 33, 34. In other words, Sere's bank records, Walker's

statements, and Sere's Form 1065 filing all suggest that Ip did not fabricate this flowchart, but

---

[11] Bradford argues (based on a prior order) that the Court already concluded that had the issuing judge known Ip hacked into LLB's servers, it would have destroyed probable cause (i.e. was material). *See* ECF No. 139 at 23. This is not so. The Court merely found that, based on the parties' initial briefs, Bradford "made a substantial preliminary showing" that (1) the affiant intentionally or recklessly omitted information from the affidavit and (2) the omission was material, as this is the standard for granting a *Franks* hearing. ECF No. 94 at 1. However, the Court explicitly noted that to ultimately prevail on a *Franks* motion, the defendant must establish both elements by a preponderance of the evidence. *Id.* (citing *United States v. Norris*, 942 F.3d 902, 909–10 (9th Cir. 2019)). The Court also stated, "[w]hether the alleged omission was actually material to the probable cause determination will be determined based on th[e] hearing." ECF No. 94 at 2. In sum, contrary to Bradford's argument, the Court did not already decide that information about Ip hacking into LLB's servers was material to probable cause.

rather, it was an authentic LLB document depicting Rockstar's involvement in Bradford's tax scheme.

Second, the affidavit relied on a 2013 Form 1040 for Stuart found on the Ip drive, which included a $502,513 K-1 loss from Sere and listed Sere as one of Stuart's partnerships. *See id.* at 30. The Ip drive also contained an email dated October 8, 2013 from Stuart to Bradford and another tax preparer at LLB. *Id.* The email stated that Stuart put $101,000 into Sere. *Id.* at 30-31. Documents returned pursuant to the federal grand jury's subpoena to Sere's bank showed that Stuart paid Sere $101,000 via check on October 3, 2013, directly corroborating the email on the Ip drive. *See id.* at 31. Walker's statement, that some LLB clients took fraudulent deductions through K-1 losses and that Stuart participated in the tax scheme further corroborate the 2013 Form 1040 found on the Ip drive. *See id.* at 27, 30. Additionally, Sere's Form 1065 did not list Stuart as a partner. *Id.* at 30, 33, 34. All this information—Sere's bank records, Walker's statements, and Sere's Form 1065—suggests that Stuart's 2013 Form 1040 and email to Bradford on the Ip drive were authentic and not fabricated by Ip.

Third, the affidavit relied on APan's tax return and tax documents for 2013, found on the Ip drive. *Id.* at 31. These documents showed that in 2013, APan claimed $751,012 in cost of goods sold. *Id.* In the tax paperwork for APan, a document showed two columns. *Id.* at 31-32. One column was labeled "tax" and highlighted green. *Id.* at 32. The other column was labeled "After Sere Adjustment" and highlighted yellow. *Id.* Also highlighted yellow was a cell showing $751,012 for cost of goods sold. *Id.* The "After Sere Adjustment" changed APan's net income from $741,581.87 to a net loss of $9,430.13. *Id.* Walker's statements corroborated these documents, as he told the government that APan participated in Bradford's tax scheme, that it took a $760,000 deduction, and that Bradford stated that APan's deduction would be enough to cover its income. *See id.* at 31. Additionally, APan was not listed as a partner on Sere's official 1065 filing with the IRS. *Id.* at 33, 34. Accordingly, Walker's statements and Sere's Form 1065 suggest that the documents on the Ip drive were authentic and not fabricated by Ip.

Fourth, the affidavit stated that the Ip drive contained seven additional client folders that contained flowcharts and/or membership purchase agreements between LLB clients and Sere

(suggesting that other LLB clients were involved in the scheme). *Id.* at 32. Walker's statement corroborated the fact that other clients participated in the tax scheme, as he stated that approximately eight or nine other clients were involved in Bradford's depreciation scheme. *Id.* Additionally, Walker's hard drive, obtained pursuant to a grand jury subpoena, further corroborated that other LLB clients were involved in the scheme. The hard drive contained LLB documents showing payments made to Sere by LLB clients. *Id.* at 45-46. These LLB clients were not listed as partners of Sere on Sere's Form 1065 filings with the IRS. *Id.* at 46. These documents suggested that seven LLB clients (named in the affidavit) were also involved in Bradford's depreciation scheme, including Moonshell, LLC. *Id.* at 46-47. The fact that other LLB clients were participating in Bradford's tax scheme was also further corroborated by Sere's bank records, which showed payments from other individuals and entities not identified as Sere's partners on its IRS filings, including Moonshell. *Id.* at 47. And no evidence in the investigation suggested that these payments were for anything other than the purchase of depreciation in connection with Bradford's fraudulent tax scheme. *Id.* Accordingly, the suggestion from the Ip drive that other LLB clients participated in the tax scheme was corroborated by Walker's statements, Walker's hard drive, and Sere's bank records.

Fifth and finally, Walker's recorded conversation with Bradford provided further corroboration for the documents on the Ip drive. During this meeting, Walker confronted Bradford about the depreciation scheme and specifically Rockstar, Stuart, and APan. *Id.* at 36. Bradford explained that the clients took a deduction and that Rockstar, Stuart, and APan were involved in a profit-sharing arrangement. *Id.* at 36-37. Bradford stated that if the IRS disagreed with this arrangement, the clients would have to adjust their tax returns and he would get his losses back. *Id.* at 37. Bradford then explained that some of the clients are not actually in an ownership agreement, but it was a way to raise capital. *Id.* Bradford's statements thus provide further support for the idea that he sold deductions and clients (including Rockstar, Stuart, and APan) took these deductions on their tax returns. His statements, along with Walker's statements, Sere's bank records, Sere's Form 1065 filings, and Walker's hard drive all suggest that the documents on the Ip drive were authentic and not somehow concocted by Ip.

Accordingly, even if the alleged omissions about Ip's credibility were included in the affidavit, the magistrate judge still would have concluded that Ip's documents were authentic because multiple independent sources provided a substantial basis to believe they were authentic.

>    **ii.    Probable Cause Would Still Exist Even if the Omitted Information Was Included and the Magistrate Judge Found the Ip Drive Not Reliable**

Even assuming the magistrate judge found Ip not credible and did not rely on the documents from the Ip drive, probable cause would still exist.

Without the information included from the Ip drive, much information remains. This includes Walker's statements to the government, Sere's bank account records, Sere's Form 1065 filings showing who its partners were, and Walker's recorded conversation with Bradford. As explained below, if the Court only considers this information (and no information from Ip or the Ip drive), probable cause would still exist.

The government interviewed Walker in October 2015, and he explained that Bradford was engaged in tax fraud and detailed how Bradford's scheme worked. *See Id.* at 27. Walker explained that Sere had accumulated a large amount of depreciation deductions. *Id.* Bradford and other partners in Sere legally claimed as much of depreciation deductions as allowed but excess depreciation remained. *Id.* As a result, Bradford approached several LLB clients and offered to sell them the excess depreciation, which would lower their tax liabilities. *Id.* Multiple clients agreed. *Id.* The clients claimed the depreciation on their taxes by claiming them as cost of goods or through a K-1 loss. *Id.* The tax scheme was fraudulent because the clients who participated were not partners in Sere when the depreciation was incurred and, therefore, not entitled to claim Sere's depreciation. *Id.*

Walker also told investigators that after he learned of Bradford's tax scheme, he reviewed LLB client files. *Id.* at 28. He identified approximately 11 to 12 clients that were involved in the scheme, including Rockstar, Stuart, and APan. *Id.*

Regarding Rockstar, Walker spoke to Rockstar's CFO and learned that Rockstar paid Bradford a large sum of money for a $2.5 million deduction related to the tax scheme with Sere.

*Id.* A federal grand jury subpoena was served on Sere's bank account during the investigation, which showed a $795,234 wire transfer from Rockstar to Sere in February 2013. *See id.* at 29-30. However, Sere's Form 1065 filed with the IRS revealed that Rockstar was not listed as a partner of Sere's. *Id.* at 33, 34. Accordingly, the government had (1) Walker's statement that Sere sold depreciation to LLB client's including Rockstar; (2) Walker's statement that Rockstar's CFO admitted Rockstar paid a large sum to Sere for a $2.5 million deduction; and (3) an approximately $800,000 wire from Rockstar to Sere even though Rockstar was not a partner of Sere's.

Walker also told the government that Stuart participated in Bradford's fraudulent tax scheme. *Id.* at 30. Walker stated that on Stuart's 2013 tax return, he took a $600,000 deduction related to Sere's depreciations. *Id.* Documents returned pursuant to the federal grand jury's subpoena to Sere's bank showed that Stuart paid Sere $101,000 via check on October 3, 2013. *Id.* at 31. The government also learned from Sere's 2013 Form 1065 filing that Stuart was not a partner in Sere. *Id.* at 30, 33, 34. Accordingly, the government had (1) Walker's statement that Sere sold depreciation to LLB client's including Stuart; and (2) a $101,000 wire from Stuart to Sere despite the fact that Stuart was not a partner of Sere's.

Walker also told the government that APan participated in Bradford's fraudulent tax scheme and took a $760,000 deduction listed as cost of sales. *Id.* at 31. Walker further stated that APan's owner and a tax preparer at LLB told Walker that Bradford stated that APan would have a large tax deduction on its tax return, and it should be "just enough to cover the income." *Id.* The government also learned that APan was not a partner of Sere's from its Form 1065. *Id.* at 33, 34. Accordingly, the government had (1) Walker's statement that Sere sold depreciation to LLB client's including APan; and (2) the fact that APan was not a partner in Sere.

Walker also told the government that approximately eight or nine other LLB clients participated in Bradford's depreciation scheme. *Id.* at 32. Walker's hard drive, produced pursuant to a grand jury subpoena, contained LLB documents showing payments from LLB clients to Sere. *Id.* at 46. These LLB clients were not listed on Sere's Form 1065 filings with the IRS as partners in Sere. *Id.* These documents suggested that seven LLB clients (named in the affidavit) were also involved in Bradford's depreciation scheme, including Moonshell, LLC. *Id.* at 46-47. Further,

Sere's bank records showed payments from four other individuals and entities not identified as Sere's partners on its IRS filings, including Moonshell, LLC. *Id.* Accordingly, the government had (1) Walker's statement that other LLB clients participated in Bradford's tax scheme with Sere; (2) a hard drive corroborating Walker's statements, including by showing payments from LLB clients to Sere (when such clients were not partners with Sere); and (3) Sere's bank statements corroborating Walker's statements and the documents on the hard drive by showing payments from non-Sere partners to Sere, including by Moonshell.

Finally, on October 20, 2015, an in-person meeting between Walker and Bradford was recorded. *Id.* at 36. During the meeting, Walker confronted Bradford about the depreciation scheme and specifically Rockstar, Stuart, and APan. *Id.* Bradford admitted that the clients took a deduction and that Rockstar, Stuart, and APan participated in a profit-sharing arrangement. *Id.* at 36-37. Bradford further confirmed that the scheme existed and operated as Walker explained by stating that if the IRS disagreed with this arrangement, the clients would have to adjust their tax returns and he would get his losses back. *Id.* at 37. Bradford then explained that some of the clients were not actually in an ownership agreement, but it was a way to raise capital. *Id.* This conversation further corroborated Walker's statements that Bradford engaged in this fraudulent scheme, how it worked, and that Rockstar, Stuart, and APan all participated in it.

All this information—Walker's statements, Sere's bank records, Sere's IRS Form 1065 filings, Walker's hard drive, and Walker's recorded conversation with Bradford—provide probable cause that Bradford was engaging in tax fraud. Accordingly, even if the magistrate judge did not find Ip credible and excised the information in the affidavit gleaned from the Ip drive, probable cause would still exist to search LLB.

### a.    Bradford's Argument that Agents *Had* to Include the Information Related to Ip's Credibility Fails

In Bradford's reply, he appears to argue that even if the documents on the Ip drive were corroborated by other evidence in the affidavit, this is irrelevant to the probable cause determination. ECF No. 139 at 21. As far as the Court can tell, Bradford appears to argue both that (1) information bearing on Ip's credibility had to be provided to the issuing judge or the

warrant was defective and (2) information establishing probable cause in the affidavit

independent of Ip and the documents he provided was so meager that his credibility was material

to the probable cause determine. *Id.* at 20, 21, 22-23. As discussed below, the Court disagrees

with both arguments.

First, the Court does not agree that the warrant was automatically defective based on the

failure to provide information bearing on Ip's credibility. Indeed, as already discussed, to prevail

on a *Franks* challenge, the defendant must establish two things: "first, that 'the affiant officer

intentionally or recklessly made false or misleading statements or omissions in support of the

warrant[,]' *and second, that the false or misleading statement or omission was material, i.e.,*

*'necessary to finding probable cause.'" United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir.

2017) (emphasis added); *see also United States v. Meling*, 47 F.3d 1546, 1553-56 (9th Cir. 1995)

(finding no *Franks* violation occurred when officers intentionally or recklessly omitted

information about an informant's credibility when affidavit included substantial independent

evidence establishing probable cause). Even if officers recklessly or intentionally omitted

information bearing on Ip's credibility, Bradford still must prove by a preponderance of the

evidence that this information was material to the probable cause determination. He has not done

so.

Second, the Court does not agree that the information establishing probable cause in the

affidavit, independent of Ip and the documents he provided, was so meager that his credibility

was material to the probable cause determination. As explained above, a wealth of information—

Walker's statements, Sere's bank records, Sere's IRS Form 1065 filings, Walker's hard drive, and

Walker's recorded conversation with Bradford—all provided probable cause that Bradford was

engaging in tax fraud. Accordingly, Ip's statement and the documents on the Ip drive were not

needed to establish probable cause.

**b.      Bradford's Suggestion that the Government Could Not Rely on Documents Discovered As A Result of Having the Ip Drive Fails**

Bradford also seems to suggest that the government could not rely on Sere's bank records because the government only knew to subpoena these records after reviewing the Ip drive. ECF No. 133 at 49; ECF No. 139 at 22, n.7. Bradford does not cite any authority for the proposition that the government could not rely on these bank records or that it was inappropriate to subpoena them because the government learned about them from the Ip drive. *See id.* Further, Bradford has never argued (let alone proved) that the government requested that Ip steal any documents (which would make the use of such documents in their investigation problematic). Accordingly, on the record before it, the Court cannot find that the government's use of the Ip drive to further its investigation (including by subpoenaing Sere's bank records) was unlawful.[12]

**IT IS THEREFORE RECOMMENDED** that Defendant's motion to suppress (ECF No. 87) be DENIED.

### NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: April 18, 2023

BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE

---

[12] The Court need not and does not reach whether Government's Exhibits 3 and 12 are admissible (which the parties dispute), as they are irrelevant to the Court's analysis. The Court does not rely on either in reaching its conclusions.