**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:19-cr-00222-GMN-BNW |
| vs. | ) | |
| | ) | **ORDER** |
| LANCE K. BRADFORD, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pending before the Court is the Report and Recommendation ("R&R") of United States Magistrate Judge Brenda Weksler, (ECF No. 149), recommending that the Court deny Defendant Lance K. Bradford's ("Defendant's") Motion to Suppress, (ECF No. 87).  Defendant timely filed an Objection, (ECF No. 152), and the Government timely filed a Response, (ECF No. 153).

For the reasons discussed below, the Court **ADOPTS** the Report and Recommendation, **DENIES** Defendant's Motion to Suppress, and **OVERRULES** the Objection.

## I.    BACKGROUND

On September 1, 2020, a Superseding Indictment[1] charged Defendant with multiple counts of Aiding and Assisting the Preparation of False Tax Returns in violation of 26 U.S.C. § 7206(2) and one count of Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371. (*See* Superseding Indictment, ECF No. 33.  The Defendant challenges the use of evidence obtained from the execution of the February 2016 search warrant alleging the  affidavit prepared by then-Federal Bureau of Investigation ("FBI") Special Agent Michael B. Elliot[2]

---

[1] The original Indictment was entered on August 27, 2019. (Indictment, ECF No. 1).
[2] (Evidentiary Hear'g Day One Tr. 19:16–25, 23:17–24:2, ECF No. 117).

("Agent Elliot Aff.") intentionally or recklessly omitted material facts and affected the probable

cause determination made by United States Magistrate Judge Nancy J. Koppe.  Magistrate

Judge Brenda Weksler granted Defendant's request for a *Franks* hearing. (ECF No. 94).  After

three days of testimony (ECF Nos. 111, 117, 129) and post-hearing briefs (ECF Nos. 133, 137,

139), Magistrate Judge Weksler determined that Defendant "did not have standing to challenge

the entire search of the LLB premises, including the server" and the "conclusion that he did not

establish the materiality of the identified omissions" to demonstrate a *Franks* violation. (ECF

No. 149)  Defendant now specifically objects to the determination that Defendant "did not have

standing to challenge the entire search of the LLB premises, including the server" and the

"conclusion that he did not establish the materiality of the identified omissions" to demonstrate

a *Franks* violation. (ECF No 152).

### A.  Agent Elliot Affidavit

The specific facts provided in Agent Elliot's Affidavit are as follows.  Defendant is a

Certified Public Accountant, founder, and partner at LL Bradford & Company ("LLB").[3]

(Agent Elliot Aff. ¶ 25(a), Ex. 1 to Def. Mot. Suppress, ECF No. 83-1).  Defendant owns and

manages Stable Development, LLC ("Stable").[4] (*Id.* ¶ 26, Ex. 1 to Def. Mot. Suppress).  Stable,

in turn, is the officer and manager of SERE[5] Holdings, LLC ("SERE"). (*Id.*, Ex. 1 to Def. Mot.

Suppress).  Defendant thereby owns and controls SERE through Stable. (*Id.*, Ex. 1 to Def. Mot.

Suppress).  All businesses "have the same address of 8880 W. Sunset Road, Las Vegas,

Nevada." (*Id.*, Ex. 1 to Def. Mot. Suppress).

---

[3] LLB stands for Leilani and Lance Bradford. (Mot. Compel Evidentiary Hear'g Tr. 119:20–25, ECF No. 129).
Leilani Bradford is Defendant's wife, who served as an administrative partner at LLB during the period set out in
the Agent Elliot Affidavit and owned seventy and a half percent (70.5%) of the business in the Leilani Bradford
Separate Property Trust. (*Id.* 119:2–5, 120:5–11, 121:20–22); (Agent Elliot Aff. ¶ 25(b), Ex. 1 to Def. Mot.
Suppress).
[4] In 2016, Defendant owned Stable with Kale Flagg, Defendant's business partner. (Mot. Compel Evidentiary
Hear'g Tr. 126:1–25).  Defendant later bought out Kale Flagg's interest in Stable at an unspecified date. (Mot.
Compel Evidentiary Hear'g Tr. 126:1–25).
[5] SERE stands for Shared Equity Real Estate. (R&R 2:24, ECF No. 88).

The Agent Elliot Affidavit described Defendant's alleged tax scheme as follows:

> [Defendant] devised a way to sell losses from one company to another company so the purchaser could deduct the loss on their Federal tax returns.  This practice was fraudulent because taxpayers may only claim losses actually incurred; they cannot purchase losses from another entity and thereby realize a tax benefit from a loss it did not incur.

(*Id.* ¶ 28, Ex. 1 to Def. Mot. Suppress).  The Government first became aware of Defendant's alleged tax scheme in May 2015, when Susan Herring ("Herring"), a former manager in LLB's Audit Department, informed the International Revenue Service, Criminal Investigation ("IRS-CI") unit that a former CPA at LLB, Dean Walker ("Walker"), told her LLB engaged in tax evasion. (*Id.* ¶ 30, Ex. 1 to Def. Mot. Suppress).  After speaking with Herring, Walker decided to meet with the IRS-CI.  In June 2015, Walker met with the IRS-CI but was reluctant to provide information for fear of losing his job. (*Id.* ¶ 31, Ex. 1 to Def. Mot. Suppress).  On July 6, 2016, Walker resigned from LLB.[6] (*Id.* ¶ 32, Ex. 1 to Def. Mot. Suppress).

In October 2015, the FBI and IRS-CI interviewed Walker.  During this interview, Walker explained that SERE had accumulated large amounts of depreciation deductions. (*Id.* ¶ 36, Ex. 1 to Def. Mot. Suppress).  According to Walker, Defendant and other partners in SERE claimed as much depreciation deductions as was allowed under the tax code. (*Id.*, Ex. 1 to Def. Mot. Suppress).  But even after claiming the permitted depreciation deductions, excess depreciation existed that SERE could not legally claim. (*Id.*, Ex. 1 to Def. Mot. Suppress).  According to Walker, Defendant approached several of his clients and offered to "sell" SERE's excess depreciation to lower their tax liabilities. (*Id.* ¶ 37, Ex. 1 to Def. Mot. Suppress).

///

---

[6] The next day, Henry Ip ("Ip"), another LLB employee, resigned. (*Id.* ¶ 32, Ex. 1 to Def. Mot. Suppress).  On July 27, 2015, Ip met with the IRS-CI but was similarly reluctant to provide information. (*Id.* ¶ 33, Ex. 1 to Def. Mot. Suppress).  At the end of the meeting, however, Ip stated "he had documents from LLB on a thumb drive (the "Ip Drive") that he had maintained while working at LLB," which he provided to IRS-CI. (*Id.*, Ex. 1 to Def. Mot. Suppress).

Multiple clients purportedly agreed to purchase SERE's excess depreciation for tax years 2012, 2013, and 2014. (*Id.* ¶ 37, Ex. 1 to Def. Mot. Suppress).   The clients claimed the depreciation on their tax returns in one of two ways: (1) by claiming the depreciation as a "cost of goods," or, (2) by Defendant issuing K-1 losses to the clients to claim on their tax returns. (*Id.*, Ex. 1 to Def. Mot. Suppress).   Walker explained that these transactions were fraudulent "because the clients were not partners in SERE when the depreciation was incurred and therefore . . . were not entitled to claim the depreciation deductions on their tax returns." (*Id.* ¶ 38, Ex. 1 to Def. Mot. Suppress).   Walker further informed investigators that he reviewed LLB's client files after learning of Defendant's tax scheme and identified eleven to twelve clients involved. (*Id.* ¶ 42, Ex. 1 to Def. Mot. Suppress).   Of this group, Walker provided several specific examples to federal agents, including: Rockstar, Inc. ("Rockstar"), Michael Stuart ("Stuart"), and APan, LLC ("APan").   Walker's explanation of each client's alleged involvement in the tax scheme is set forth below. (*Id.*, Ex. 1 to Def. Mot. Suppress).

### 1. Rockstar

After learning of the alleged depreciation scheme, Walker spoke with Rockstar's CFO Mark Borgan ("Borgan").[7] (*Id.* ¶ 43, Ex. 1 to Def. Mot. Suppress).   Borgan explained that he spoke with Rockstar's part-owner Jeannette Wiener ("Weiner") regarding Rockstar's 2012 tax return. (*Id.*, Ex. 1 to Def. Mot. Suppress).   Weiner revealed that she paid Defendant a large sum of money in return for a $2,500,000.00 tax deduction related to the depreciation scheme. (*Id.*, Ex. 1 to Def. Mot. Suppress).   According to Walker, Defendant advised Weiner that the deduction would be written off as a deduction for cost of goods sold. (*Id.*, Ex. 1 to Def. Mot. Suppress).

IRS-CI subsequently searched the Ip Drive for information related to Rockstar. (*Id.* ¶ 44, Ex. 1 to Def. Mot. Suppress).   This search revealed flowcharts illustrating the depreciation and deduction scheme. (*Id.*, Ex. 1 to Def. Mot. Suppress).   One such flowchart depicted Rockstar

---

[7] Borgan was also a CPA at LLB. (*Id.* ¶ 43, Ex. 1 to Def. Mot. Suppress).

investing $795,234.00 in SERE for a $5,301,562.00 depreciation/K-1 loss for federal and state taxes.[8] (*Id.* ¶¶ 44–45, Ex. 1 to Def. Mot. Suppress).

IRS-CI also reviewed SERE's completed Form 1065 for the 2013 tax year, which SERE is required to complete each year. (*Id.* ¶¶ 57–58, Ex. 1 to Def. Mot. Suppress).  Form 1065 requires partnerships to report their partners and the percentage of ownership each partner holds. (*Id.* ¶ 58, Ex. 1 to Def. Mot. Suppress).  This requirement helps prevent tax fraud because partners are only allowed to make claims on their tax returns, such as gains, losses, and depreciation, based on their percentage of ownership. (*Id.*, Ex. 1 to Def. Mot. Suppress).  "A common indicator of tax fraud is a person or entity claiming a loss or depreciation from a partnership but not being listed on the partnerships' Form 1065." (R&R 5:25–27 (citing Agent Elliot Aff. ¶ 58, Ex. 1 to Mot. Suppress)).  SERE's 2013 Form 1065 did not list Rockstar as a partner. (Agent Elliot Aff. ¶¶ 58–60, Ex. 1 to Def. Mot. Suppress).

### 2.  Stuart

According to Walker, Stuart was another one of Defendant's clients that participated in the fraudulent deduction scheme. (*Id.* ¶ 49, Ex. 1 to Def. Mot. Suppress).  Walker stated that on Stuart's 2013 tax return, he took a $600,000.00 deduction related to SERE's depreciations. (*Id.*, Ex. 1 to Def. Mot. Suppress).

IRS-CI searched the Ip Drive for documents related to Stuart and discovered a 2013 Form 1040 for Stuart, which included a $502,513.00 K-1 loss from SERE and listed SERE as one of Stuart's partnerships. (*Id.* ¶ 50, Ex. 1 to Def. Mot. Suppress).  But according to SERE's 2013 Form 1065, Stuart is not a partner in SERE. (*Id.* ¶ 59, Ex. 1 to Def. Mot. Suppress).

///

---

[8] A federal grand jury subpoena was served on SERE's bank account during the investigation. (*Id.* ¶ 46, Ex. 1 to Def. Mot. Suppress).  Documents returned pursuant to this subpoena showed a $795,234.00 wire transfer from Rockstar to SERE on February 21, 2013, corresponding with the amount depicted in the flowchart on the Ip drive. (*Id.* ¶ 46, Ex. 1 to Def. Mot. Suppress).

The Ip Drive also contained an email dated October 8, 2013, from Stuart to Defendant and another tax preparer at LLB. (*Id.* ¶ 50, Ex. 1 to Def. Mot. Suppress).  The email stated that Stuart put $101,000.00 into SERE.[9] (*Id.*, Ex. 1 to Def. Mot. Suppress).  "Additionally, this payment and the K-1 loss from [SERE] on Stuart's Form 1040 suggest Stuart fraudulently purchased its loss from [SERE] to reduce his tax liability." (R&R 6:13–15) (citing Agent Elliot Aff. ¶ 50, Ex. 1 to Def. Mot. Suppress).

### 3.  APan

Walker also stated that APan participated in Defendant's tax scheme and took a $760,000.00 deduction listed as "cost of sales." (Agent Elliot Aff. ¶ 52, Ex. 1 to Def. Mot. Suppress).  APan's owner, as well as a tax preparer at LLB, informed Walker that Defendant stated APan would have a large tax deduction on its tax return, and it would be "just enough to cover the income." (*Id.* ¶ 53, Ex. 1 to Def. Mot. Suppress).

IRS-CI searched the Ip Drive for documents relating to Apan and discovered APan's tax returns and work papers for 2012. (*Id.*, Ex. 1 to Def. Mot. Suppress).  In 2013, APan claimed $751,012.00 in cost of goods sold. (*Id.*, Ex. 1 to Def. Mot. Suppress).  One column was labeled "tax" and highlighted green. (*Id.*, Ex. 1 to Def. Mot. Suppress).  The other column was labeled "After SERE adjustment" and highlighted yellow. (*Id.* ¶ 54, Ex. 1 to Def. Mot. Suppress).  Also highlighted yellow was a cell showing $751,012 for cost of goods sold. (*Id.*, Ex. 1 to Def. Mot. Suppress).  The "After SERE Adjustment" changed APan's net income from $741,581.87 to a net loss of $9,430.13. (*Id.*, Ex. 1 to Def. Mot. Suppress).  APan was not listed as a partner on SERE's Form 1065 for 2012 or 2013. (*Id.* ¶¶ 59–60, Ex. 1 to Def. Mot. Suppress).

///

///

---

[9]  Documents returned pursuant to the federal grand jury subpoena of SERE's bank account showed Stuart paid SERE $101,000.00 via check on October 3, 2013. (*Id.* ¶ 50, Ex. 1 to Def. Mot. Suppress).  This amount corresponded with the amount detailed in the email on the Ip drive. (*Id.* ¶ 50, Ex. 1 to Def. Mot. Suppress).

### 4.  Other Clients

Walker advised that approximately eight or nine other clients were involved in Defendant's depreciation scheme. (*Id.* ¶ 55, Ex. 1 to Def. Mot. Suppress).  IRS-CI searched the Ip Drive for additional clients participating in the scheme and discovered seven additional client folders containing flowcharts and/or membership purchase agreements between LLB clients and SERE. (*Id.*, Ex. 1 to Def. Mot. Suppress).

On October 8, 2014, Walker revealed he had a portable hard drive containing many LLB client files. (*Id.* ¶ 83, Ex. 1 to Def. Mot. Suppress).  Walker stated that he copied these files "immediately prior to resigning from LLB." (*Id.*, Ex. 1 to Def. Mot. Suppress).  Walker gave the hard drive to the Government pursuant to a grand jury subpoena in November 2015. (*Id.* ¶ 85, Ex. 1 to Def. Mot. Suppress).  Government agents subsequently searched the hard drive pursuant to a search warrant. (*Id.* ¶ 86, Ex. 1 to Def. Mot. Suppress).  The hard drive contained LLB documents showing payments made to SERE by LLB clients. (*Id.*, Ex. 1 to Def. Mot. Suppress). These LLB clients were not listed as partners on SERE's Form 1065. (*Id.*, Ex. 1 to Def. Mot. Suppress).  "These documents suggested that seven LLB clients (named in the affidavit) were also involved in [Defendant's] depreciation scheme, including Moonshell, LLC." (R&R 7:14–15 (citing Agent Elliot Aff. ¶¶ 86–87, Ex. 1 to Def. Mot. Suppress)).  Agent Elliot thus opined, "no evidence revealed in the investigation [] suggest[s] [] these payments [were] for anything other than for the purchase of fraudulent depreciation in connection with" Defendant's tax fraud scheme. (Agent Elliot Aff. ¶¶ 86–87, Ex. 1 to Def. Mot. Suppress).

### 5.  Walker's Recorded Conversation with Defendant

Walker and Defendant met in person on October 20, 2015. (*Id.* ¶ 66, Ex. 1 to Def. Mot. Suppress). Walker recorded the meeting at the FBI's direction and without Defendant's knowledge. (*Id.*, Ex. 1 to Def. Mot. Suppress).  During the meeting, Walker confronted Defendant about the depreciation scheme, specifically asking questions about Rockstar, Stuart, and APan.

(*Id.* ¶ 68, Ex. 1 to Def. Mot. Suppress).  Defendant explained that the clients took a deduction and that Rockstar, Stuart, and APan were involved in a profit-sharing arrangement. (*Id.*, Ex. 1 to Def. Mot. Suppress).  Defendant further stated that if the IRS disagreed with the arrangement, the clients would have to adjust their tax returns and he would get the losses back. (*Id.*, Ex. 1 to Def. Mot. Suppress).  Defendant then explained that some of the clients were not involved in an ownership agreement, but rather, were included to raise capital. (*Id.*, Ex. 1 to Def. Mot. Suppress).

Agent Elliot contended that selling losses to a client as part of a profit-sharing arrangement is not a generally accepted practice, nor does it justify the deductions claimed by the clients on their tax returns. (*Id.* ¶ 69, Ex. 1 to Def. Mot. Suppress).  IRS-CI maintains that such a practice is fraudulent and illegal. (*Id.*, Ex. 1 to Def. Mot. Suppress).

### C.  The Alleged Data Breach

LLB stored its client data in a tax preparation software service called CCH. (Evidentiary Hear'g Tr. Day Two 45:1–25, ECF No. 117).  CCH's records track every time an LLB user logs into its system through their username and password. (*Id.*).  Defendant avers CCH logins reveal that individuals at Barlow Douglas, the accounting firm where Walker and Ip worked after leaving LLB, accessed and took LLB tax returns using an LLB employee's login credentials on at least five occasions between July 10, 2015, and July 17, 2015. (Def. Post Hear'g Br. 11:16–12:6, ECF No. 133).  According to Defendant, emails between Walker and Ip demonstrate that they were the individuals who improperly accessed and copied LLB's client tax records. (*Id.* 12:7–14).

The Agent Elliot Affidavit states that Walker and Ip resigned on July 6 and 7 2016. (Agent Elliot Aff. ¶ 32, Ex. 1 to Def. Mot. Suppress).  Based on the login dates of the alleged hackers, Defendant argues that Government agents failed to disclose to Magistrate Judge Koppe that the documents they received from "Ip on the Ip Drive were stolen." (Evidentiary Hear'g Tr. Day Two 14:17–18).

### D.  Facts Related to Standing

LLB is a "mid-size accounting firm" that provides several services including, among others, auditing, consulting, accounting, and tax preparation. (Agent Elliot Aff. ¶ 25, Ex. 1 to Def. Mot. Suppress).  LLB's operations are spread across four offices in three states. LLB Phone Rs. at 1, Ex. 9 to Gov. Ex. & Witness List).  Specifically, LLB has two offices in Nevada, one in Kansas, and one in Texas. (LLB Phone Rs. at 1, Ex. 9 to Gov. Ex. & Witness List); (Mot. Compel Evidentiary Hear'g Tr. 98:12–99:14).  Leilani Bradford[10] testified that Defendant signed the lease for LLB's offices.  (*Id.* 125:18–25).  LLB is located within a building owned by Stable, and Stable is owned by Defendant. (Mot. Compel Evidentiary Hear'g Tr. 66:17–25, 125:18–25).  "[Defendant] had full access to LLB's office, including its servers." (R&R 10:11) (citing Mot. Compel Evidentiary Hear'g Tr. 81:11–23, 84:3–8, 114:2–19).

Tenille Lapito ("Lapito"), LLB's firm administrator, testified that forty-nine people were employed by LLB in February 2016 based on the health insurance records kept by the company. (Mot. Compel Evidentiary Hear'g Tr. 65:17–19, 66:2–9).  This number does not include part-time employees without insurance. (*Id.* 91:16–22).  Additionally, Lapito did not clarify whether these employees all worked at the LLB office located at 8880 W. Sunset Road, Las Vegas, Nevada ("Sunset Road office"), which was searched.  In contrast to Lapito's calculation, an LLB phone record list from 2016 showed fifty-six LLB employees worked at the Sunset Road office.[11] (LLB Phone Rs. at 1, Ex. 9 to Gov. Ex. & Witness List).

---

[10] Because Defendant and Leilani Bradford share the same last name, the Order refers to Leilani Bradford as ("Leilani") for clarity.

[11] A summary of LLB's tax records showed it employed more than forty-nine employees from 2013 to 2015. (*See* Mot. Compel Evidentiary Hear'g Tr. 141:24–142:16) (showing LLB employed sixty-seven (67) employees in 2013, seventy-six (76) employees in 2014, and sixty-five (65) employees in 2015).  "However, the [G]overnment did not have any information from the IRS to tell how many employees were employed by LLB in 2016 when the warrant was executed." (R&R 9:26–28) (citing Mot. Compel Evidentiary Hear'g Tr. 143:1–25).

When the search warrant was executed, ownership of LLB was divided among three individuals: Leilani owned seventy and a half (70.5) percent of LLB through the Leilani Bradford Separate Property Trust (the "Trust");[12] Dustin Lewis ("Lewis") owned nineteen (19) percent; and Mike Harman ("Harman") owned ten and a half (10.5) percent. (Mot. Compel Evidentiary Hear'g Tr. 121:20–22); (LLB Fourth Totally Restated & Am. Operating Agreement at 5, Ex. P to Gov. Ex. & Witness List).  Defendant had no ownership interest in LLB. (*See generally* LLB Fourth Totally Restated & Am. Operating Agreement, Ex. P to Gov. Ex. & Witness List); (*see also* Mot. Compel Evidentiary Hear'g Tr. 121:3–5).  Leilani testified that Defendant acted as a "non-member manager" for LLB.[13] (Mot. Compel Evidentiary Hear'g Tr. 122:20).

LLB's operating agreement vested Defendant with the "authority to manage the day-to-day operation[s] of the business[.]" (LLB Fourth Totally Restated & Am. Operating Agreement at 8, Ex. P to Gov. Ex. & Witness List).  Although Defendant had the authority to manage the day-to-day operations of LLB under the operating agreement, Leilani testified that he exercised a more limited role.  Specifically, Leilani explained that Defendant did "executive management" for LLB, sourced clients, raised capital funding, and provided guidance to partners. (Mot. Compel Evidentiary Hear'g Tr. 122:20–25, 125:6–12).  Defendant also had authority to execute documents on behalf of LLB. (*Id.* 125:13–25).  Leilani testified that Defendant "was not involved much with employees or the work of completing tax returns, financials, audits, and the like." (R&R 8:19–21) (citing Mot. Compel Evidentiary Hear'g Tr. 124:7–125:5).

---

[12] Leilani's ownership interest was held in the Trust for estate planning purposes. (Mot. Compel Evidentiary Hear'g Tr. 121:23–122:13).  Specifically, the Trust was established to "protect . . . personal assets" in the event of litigation against her or Defendant. (*Id.*).

[13] As the Magistrate Judge noted, LLB's operating agreement "did not list [Defendant] as a non-member manager, but instead confusingly called him a member-manager (though he owned no part of the business)." (R&R 8:26–27) (citing the Motion to Compel Evidentiary Hear'g Tr. and LLB's Operating Agreement).

When the search warrant was executed, the Sunset Road office was searched. (Mot. Compel Evidentiary Hear'g Tr. 85:1–6). This included Defendant's office and Lapito's office. (*Id.*). Lapito did not share her office with another LLB employee. (*Id.* 69:6–7). Lapito testified, however, that Defendant "permitted to come and go" from her office "as he pleased." (*Id.* 69:8–10).

Lapito had filing cabinets in her office. She had a main cabinet, which she also referred to as a lower cabinet, behind her desk that she locked at night and unlocked when she returned to work. (*Id.* 70:3–71:25). Lapito initially testified that only she had access to the keys used to lock this cabinet, (*id.* 70:22–71:1), but later stated Defendant also had access to the keys. (*Id.* 87:12–17). Lapito kept original corporate documents in this cabinet on behalf of Defendant, including, "operating agreements, membership purchase agreements, investor documents, [and] promissory notes[.]" (*Id.* 71:2–11). Lapito also had "little file drawers" she did not typically lock, as well as a filing cabinet "on top" that she never locked. (*Id.* 70:11–14). The documents left in these drawers and cabinets included, but were not limited to, financial documents, tax records, and investor documents. (*Id.* 71:22–72:9).

The day the search warrant was executed, Lapito had a brown bag of binders in her office from Defendant. (*Id.* 71:8–72:14). These binders contained various documents Defendant was compiling to give to the Government and included tax and financial documents related to the "data breach." (*Id.* 72:15–73:1, 115:25–116:21). Lapito also stored personal documents and documents for Defendant in three or four large four-drawer lateral cabinets behind an orange wall by LLB's copiers. (*Id.* 73:5–12). Lapito kept these filing cabinets locked. (*Id.* 73:13–14).

///

///

///

### E.  The Magistrate Judge's R&R

On March 30, 2022, Defendant filed a Motion to Suppress and Request for a *Franks* Hearing, (ECF No. 83), arguing that the Agent Elliot Affidavit recklessly or intentionally failed to include that Ip and Walker "hacked" into LLB servers after resigning from LLB to steal documents later provided to agents. (*Id.*).  Defendant maintains that this omission requires information relating to the Ip Drive to be excised from the Agent Elliot Affidavit, and that without this information, the rest of the search warrant "must fall" because of a "complete lack of credible evidence . . . to support a finding that . . . there was sufficient probable cause to justify the warrant." (*Id.* 22:2–6).  The Government filed a Response to Defendant's Motion addressing his contentions and separately observing in a footnote that the Government "does not waive any arguments regarding [Defendant's] lack of standing to challenge the search of LLB's files since he had no ownership interest in the firm or its files." (Resp. Def. Mot. Suppress 17:18–20, ECF No. 88).

The Magistrate Judge subsequently granted Defendant's request for a *Franks* hearing. (ECF No. 94).  Over the course of three days, the Magistrates Judge conducted evidentiary hearings on Defendant's Motion. (ECF Nos. 111, 117, 129).  The parties then filed post-hearing briefs. (ECF Nos. 133, 137, 139).  The Magistrate Judge later issued an R&R with the following findings: (1) the Government did not waive its ability to challenge Defendant's standing to bring his *Franks* Motion; (2) Defendant had standing in part to challenge the search of the Sunset Road office; and (3) Defendant did not establish a *Franks* violation. (*See generally* R&R).  Defendant then filed the instant Objection, (ECF No. 152).

## II.  <u>LEGAL STANDARD</u>

Local Rule IB 3-2 states, "any party may file specific written objections to the findings and recommendations of a magistrate judge made pursuant to Local Rule IB 1-4." 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2.  Upon the filing of such objections, the Court must make a *de*

*novo* determination of those portions of the Report and Recommendation to which objections are made. *Id.* The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. IB 3-2(b). Accordingly, the Court will conduct a *de novo* review of the portions of the Magistrate Judge's Report and Recommendation to which objections were made.

## III.   DISCUSSION

Defendant challenges the Magistrate Judge's findings regarding (1) whether Defendant had standing in part to challenge the search of the Sunset Road office, and (2) whether Defendant failed to establish a *Franks* violation. (*Id.* 11:9–13). Specifically, Defendant objects to the Magistrate Judge's determination that Defendant "did not have standing to challenge the entire search of the LLB premises, including the server" and the "conclusion that he did not establish the materiality of the identified omissions" to demonstrate a *Franks* violation. (*Id.*). The Court begins by examining Defendant's standing arguments.

### A. Fourth Amendment Standing

A defendant asserting a Fourth Amendment challenge bears the burden of establishing standing. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995). "Standing" in the Fourth Amendment context is "different and distinct from Article III standing." *United States v. Hansen*, No. 4:18-cr-00346, 2019 WL 5846879, at *3 (D. Idaho Nov. 7, 2019). The Ninth Circuit has explained this difference:

> The term "standing" is often used to describe an inquiry into who may assert a particular [F]ourth [A]mendment claim. Fourth Amendment standing is quite different, however, from "case or controversy" determinations of [A]rticle III standing. Rather, it is a matter of substantive [F]ourth [A]mendment law; to say that a party lacks [F]ourth [A]mendment standing is to say that *his* reasonable expectation of privacy has not been infringed. It is with this understanding that we use "standing" as a shorthand term.

///

///

*United States v. Taketa*, 923 F.2d 665, 669–70 (9th Cir. 1991) (emphasis in original) (internal citations omitted).

Here, Defendant argues the Magistrate Judge erred in finding that he did not have standing to challenge the entire search of the Sunset Road office. (Obj. 12:1–13:8). Alternatively, even if Defendant does not have standing to challenge the entire search of the Sunset Road office, he nevertheless maintains he has standing to challenge the search of Lapito's office and filing cabinets. (*Id.* 13:9–14:8). Each argument will be examined in turn.

### 1. Standing to Search Entire Premises of the Sunset Road Office

In *United States v. SDI Future Health, Inc.*, the Ninth Circuit reversed and remanded a decision finding that two individuals who were controlling shareholders and corporate officers of a business had standing to challenge a search of the business. 568 F.3d 684 (9th Cir. 2009). The Ninth Circuit stated, "it does not suffice for Fourth Amendment standing to merely own a business, to work in a building, or to manage an office." *Id.* at 697. The court went on to state that "except in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized." *Id.* at 698.

The Ninth Circuit compared the facts of the case to its earlier decision in *United States v. Gonzalez, Inc.*, in which the owners of "a small-family run business housing only 25 employees at its peak" had "managerial control over its day-to-day operations" and "full access to the building." 412 F.3d 1102, 1117 (9th Cir. 2005). Additionally, the family personally owned the premises housing the business' headquarters and leased it to the company. *Id.* at 1119. Given these facts, the owners had a reasonable expectation of privacy in the entire premises. *Id.* at 1117.

///

Unlike the defendants in *Gonzalez*, however, the defendants in *SDI Future Health* "at most . . . managed and worked in the office of a business of which they were, together, controlling shareholders," one that was "twice the size" of the office in *Gonzalez*. *SDI Future Health*, 568 F.3d at 697. Although they "owned and had authority to set policy" at the business, this rationale was "too broad and generalized" to support a finding of Fourth Amendment standing. *Id.* The Ninth Circuit ultimately remanded the case for further fact-finding.

The Magistrate Judge analogized the facts of this case to the facts in *SDI Future Health* and found that Defendant "cannot satisfy the small business test laid out in *Gonzalez* to establish standing to challenge the search of [the Sunset Road] office." (R&R 13:3–5). Defendant argues the Magistrate Judge erred because the "facts here more closely mirror those in *Gonzalez*." (*Id.* 13:6–7). Specifically, Defendant notes that (1) the majority of LLB was owned in the Trust, which is controlled by Defendant's wife; (2) LLB's operating agreement vested him with the "authority to manage the day-to-day operations of the office[;]" (3) he had full access to LLB at the Sunset Road office; and (4) he "effectively owned the building where [the Sunset Road] office w[as] located through his company[,]" Stable. (*Id.* 13:11–14:8).

### a. Leilani's Ownership Interest in LLB

When the search was executed, Leilani owned seventy and a half percent (70.5%) of LLB through the Trust. Defendant contends that he can vicariously show ownership of LLB through his wife. (*See* Def. Post Hear'g Reply Br. 27:2–3, ECF No. 139) (arguing that "[b]y any reasonable definition of the term," LLB is a "closely owned and managed company, with more than two thirds controlled by the Bradford family"). This argument is contrary to law and belied by the record before the Court.

Defendant's theory rests on the proposition that the Trust can be considered marital property for which he can vicariously assert ownership to show standing. But the Supreme

Court has long held that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  Defendant cites no other fact in support of his argument, and the Court finds that the existence of the Trust alone does not demonstrate Defendant's ownership interest. *See United States v. Taketa*, 923 F.2d 665, 6570 (9th Cir. 1991).  Moreover, Defendant cites no authority, nor has the Court found any, to support his marital property theory for standing.  Indeed, "such a theory for standing would have Fourth Amendment rights turn on the vagaries of state law, as not all states employ marital property rules." *United States v. Schampers*, No. 22-cr-30, 2023 WL 3324925, at *11 (E.D. Wis. Feb. 1, 2023).

Furthermore, the record before the Court belies Defendant's argument.  Leilani testified that before the Trust was created, she and Defendant jointly possessed an ownership interest in LLB. (Mot. Compel Evidentiary Hear'g Tr. 121:23–122:2).  Leilani explained that they subsequently established the Trust for estate planning purposes, whereby Defendant's interest was conveyed to her to protect personal assets in the event of litigation against Defendant. (*Id.* 121:23–122:13).  LLB's operating agreement reflects that Defendant possessed no ownership interest in LLB. (LLB Fourth Totally Restated & A. Operating Agreement at 5, Ex. P to Gov. Ex. & Witness List).  Defendant cannot disclaim and surrender ownership of LLB only to vicariously claim ownership when convenient.  Accordingly, the record before the Court shows that Defendant had no ownership interest in LLB.

### b.  Authority to Manage the Day-to-Day Operation of LLB

Defendant next emphasizes that the LLB operating agreement imbued Defendant with "authority to manage the day-to-day operations of the office." (Obj. 13:14–15).  According to Defendant, in *Gonzalez*, the Ninth Circuit stressed that the "defendants had 'managerial control' over the daily operations of the company." (*Id.* 13:15–17) (quoting *Gonzalez*, 412 F.3d ///

at 1117).  Thus, Defendant contends that whether he possessed "management authority" should be the focal point of the Court's inquiry. (Obj. 14:5–6).

Defendant's argument conflates the *ability* to exercise managerial control with the *actual exercise* of managerial control.  *Gonzalez* and *SDI Future Health* concerned whether a defendant actively managed and controlled the operations of a business. *See, e.g.*, *Gonzalez*, 412 F.3d at 117 ("In reaching this result, we do not rule out the possibility that the hands-off executives of a major corporate conglomerate might lack standing to challenge all intercepted conversations at a commercial property that they owned, but rarely visited."); *SDI Future Health*, 568 F.3d at 698 (noting *Gonzalez* exception applies only "in the case of a small business over which an individual *exercises daily management and control*") (emphasis added). To adopt Defendant's position would effectively elevate an individual's title over the substantive work they complete for the business. *See SDI Future Health, Inc.*, 568 F.3d at 697 ("[I]t does not suffice for Fourth Amendment standing merely to own a business, to work in a building, or to manage an office"); *see also United States v. Nova*k, No. 13-cr-312, 2015 WL 720970, at *6 (N.D. Ill. Feb. 18, 2015) ("Permitting the president, CEO, or overall manager of any enterprise to assert Fourth Amendment standing in the entire premises of the business likely would expand the reach of the exclusionary rule far past the point any court has been willing to take it.").  Therefore, while the Court notes that Defendant was vested with the authority to manage LLB, its inquiry is directed at the specifics concerning his control over LLB's day-to-day today operations. *See, e.g.*, *United States v. Torres*, No. 19-cr-03255, 2021 WL 5178444, at *3 (S.D. Cal. Nov. 8, 2021) ("[E]ven assuming that Victor Gonzalez's status as a pastor involved some managerial authority, that alone would not be sufficient to confer standing."); *United States v. Torres-Ramos*, No. 06-cr-656, 2008 WL 4667119, at *12 (C.D. Cal. Oct. 17, 2008) ("Furthermore, George Torres has been intimately involved in the operation of the Numero Uno markets since day one, and has taken strenuous efforts to maintain his

involvement in all aspects of each store."); *Novak*, 2015 WL 720970, at *6 (explaining that defendant failed to describe any meaningful description of specific tasks performed concerning day-to-day operations of business).

Leilani explained that Defendant conducted "executive management" for LLB, sourced clients, raised capital funding, and provided guidance to partners. (Mot. Compel Evidentiary Hear'g Tr. 122:20–25, 125:6–12).  She further testified that Defendant also had the authority to execute documents on behalf of LLB. (*Id.* 125:13–25).  However, Leiliani acknowledged that Defendant "was not involved much with employees or the work of completing tax returns, financials, audits, and the like." (R&R 8:19–21) (citing Mot. Compel Evidentiary Hear'g Tr. 124:7–125:5).

The Court agrees with the Magistrate Judge that, like the defendant in *SDI Future Health*, Defendant here operated as a "policymaker" responsible for "higher level" decisions "regarding clients, funding, and the direction of the firm." (R&R 14:18–20).  Defendant's position was directed at setting general policy rather than personally managing the daily operations of LLB. *See SDI Future Health*, 568 F.3d at 697 (determining that *Gonzalez* was not applicable where "the magistrate judge's findings d[id] not show that [the defendants] personally managed the operation of the office on a daily basis, only that they set its general policy as officers of SDI").  Accordingly, although Defendant had the discretion to manage the day-to-day operation of LLB, the Court finds he did not actually manage the day-to-day operations of the business.

### c.  Ownership of the Building LLB & Access to the Building

Defendant also notes that he "effectively owned the building where [the Sunset Road] office w[as] located through his company," Stable. (Obj. 13:19–23).  While Defendant acknowledges "ownership does not confer 'automatic standing,'" he nevertheless maintains his property ownership and access to anywhere in the building are factors to be considered in the

Court's analysis. (*Id.* 13:20–25).  In *SDI Future Health*, the Ninth Circuit observed the *Gonzalez* defendants' standing was directly tied to the "'nature of the location.'" *SDI Future Health*, 568 F.3d at 696 (quoting *Gonzalez*, 412 F.3d at 1116.  The Ninth Circuit noted that the *Gonzalez*

> defendants exercised, in the context of "a small, family-run business housing only 25 employees at its peak," "managerial control over [the] day-to-day operations" of the office where the conversations the wiretap "seized" took place, *they owned the building where the office was located*, and they not only could access the office but actually "'exercised full access to the building.'"

*SDI Future Health*, 568 F.3d at 696 (emphasis added) (quoting *Gonzalez*, 412 F.3d at 1116–17).

The Ninth Circuit's inclusion of the *Gonzalez* defendants' ownership of the building where the office was located lends itself to Defendant's position that ownership is a relevant factor in this context.  Moreover, following *SDI Future Health*, district courts both within and outside the Ninth Circuit have considered a defendant's ownership of the building where the company was located in their Fourth Amendment standing analysis. *See Hansen*, 2019 WL 5846874, at *6 (determining defendant had Fourth Amendment standing where he owned ninety percent of the company that was searched, owned the building where the company had office space, was the CEO of the company, and managed the day-to-day operations of the company); *United States v. King*, 212 F. Supp. 3d 1113, 1121 (W.D. Okla. 2015) (considering defendant's ownership of building in which company was housed in finding he had standing to bring Fourth Amendment challenge); *United States v. Lamb*, No. 2:11-cr-35, 2012 WL 1156490, at *3 (S.D. Ohio Apr. 6, 2012) (finding corporate owner defendant had Fourth Amendment standing where he owned the property the businesses that were searched were located on, "maintained all the keys to the locks on the buildings[,] and knew the combinations to the safes in the offices" found in the buildings).

It bears noting that Defendant's ownership of the building LLB was leasing differs from the *Gonzalez* defendants' ownership in one material way: the defendants in *Gonzalez* owned the buildings themselves, although they leased it to their corporation. *Gonzalez*, 412 F.3d at 1109; *see United States v. Salyer*, 814 F. Supp. 2d 984, 989 (E.D. Cal. 2011) ("However, it is the case that the [defendants'] personally owned the premises that housed GST's headquarters, and leased it to GST."). By contrast, Defendant owned a corporation, Stable, which in turn owned the building where LLB was located. (Mot. Compel Evidentiary Tr. 66:10–25, 87:18–23, 89:19–25, 125:22–126:25). Thus, the instant ownership structure is more attenuated than the facts presented in *Gonzalez* because of the presence of an intermediary corporation. Stable is the direct owner of the building where LLB is located, and Defendant indirectly owns the building through Stable. The Court does not ignore that Defendant, through Stable, ultimately owns the building in which LLB is located.

At bottom, however, Defendant, through Stable, functioned as the landlord to LLB. Courts have held that landlords do not have a reasonable expectation of privacy with respect to properties leased to third parties, simply on the basis that they own the property. *See Rozman v. City of Columbia Heights*, 268 F.3d 588 (8th Cir. 2001) (holding that landowner lacked standing to assert his tenants' rights in seeking to challenge the searches of tenants' apartments without their permission pursuant to city ordinance requiring annual rental inspection); *Miller v. Hassinger*, 173 F. App'x 948, 952 (3d Cir. 2006) (unpublished) (finding that landlord had no privacy interest in the apartment searched where it had been leased to third parties and landlord did not have access to the apartment, did not have personal items in the apartment, and did not allege any access to the apartment); *Johnson v. Weaver*, 248 Fed. App'x 694, 697 (6th Cir.2007) (concluding that state department of natural resources officers did not violate property owner's Fourth Amendment rights when they knocked on door of tenant's house, notwithstanding owner's prior order to officers to stay off his property, since the tenant lived

there, and plaintiff's "ownership alone d[id] not create a reasonable expectation of privacy").  In this context, ownership of premises alone does not automatically confer standing.  Therefore, while the Court considers Defendant ultimately owns the building the Sunset Office was located within, it does not assign dispositive weight to his ownership.

As to Defendant's remaining argument concerning access, district courts have interpreted "access" to denote the ability to freely enter areas throughout the business and exclude others. *See, e.g., United States v. Wetselaar*, No. 2:11-cr-00347, 2013 WL 8206582, at *6 (D. Nev. Dec. 31, 2013) ("Given that he is the only doctor practicing at the medical group, [defendant] has full access to the medical office and manages its daily activities."); *Hansen*, 2019 WL 5846879, at *4 (noting that defendant "had full access to the Yellowstone offices—including the server room"); *Torres-Ramos*, 2008 WL 4667119, at *12 (observing the defendant "exercised full access to the Alvarado Store manager's office").  Here, Defendant had access to "anybody else's office" or the server which stored documents related to LLB's operations. (Mot. Compel Evidentiary Hear'g Tr. 81:1–25).  Nevertheless, the Court is cognizant that, "were the ability to" access the premises or "exclude the uninvited is a significant factor in the Fourth Amendment analysis, it would verge on a rule that ownership without more confers standing, which is not the law." *Novak*, 2015 WL 720970, at *6.  Accordingly, while the Court considers Defendant's access to the premises and server at LLB, it does not assign this fact dispositive weight.

### d.  Additional Facts

The Court also considers the size of LLB as measured by the number of people it employed at the time the search warrant was executed.  The Magistrate Judge found that LLB is not a small business because, among other facts, "LLB employed at least 49 people (as opposed to *Gonzalez*'s 25 employees)." (R&R 14:8–10).  But, as Defendant notes, LLB's employees were "spread out over multiple" offices at the time of the search. (Obj. 13:27–28).

In *Gonzalez*, the defendants' business was a bus company with terminals in nine Western states. *Gonzalez*, 412 F.3d at 1106.  The business' headquarters, however, "was a rather more modest affair, housed in a building on Blake Avenue in Los Angeles." *Salyer*, 814 F. Supp. 2d at 989 (citing *Gonzalez*, 412 F.3d at 1106.  The Ninth Circuit described the Blake Avenue office as a "small, family run-business housing only 25 employees at its peak." *Gonzalez*, 412 F.3d at 1115.  Thus, it appears that the Blake Avenue building "was the 'small, family-run business' that the *Gonzalez* court was referring to" in which the Ninth Circuit considered only the employees housed at that building in its analysis. *Salyer*, 814 F. Supp. 2d at 989 (citing *Gonzalez*, 412 F.3d at 1108).

Like the bus company in *Gonzalez*, LLB's operations are spread across four different offices in three different states.[14] (LLB Phone Rs. at 1, Ex. 9 to Gov. Ex. & Witness List); (Mot. Compel Evidentiary Hear'g Tr. 98:12–99:14).  Lapito testified that forty-nine people worked at LLB in February 2016 based on LLB's health insurance information.  In contrast, an LLB phone record list shows that the Sunset Road office employed fifty-six individuals.[15] (LLB Phone Rs. at 1, Ex. 9 to Gov. Ex. & Witness List).

Ultimately, Defendant bears the burden of showing he has standing to challenge the search of the Sunset Road office. *See United States v. Lee*, No. 3:21-cr-00117, 2023 WL 3881382, at *5 (D. Alaska Feb. 16, 2023) ("'In a motion to suppress, the Defendant has the burden of establishing that his own Fourth Amendment rights were violated by the challenged

---

[14] The number of LLB locations does not preclude the applicability of the *Gonzalez* "small business" label. *See Hansen*, 2019 WL 5846879, at *5–6 ("The number of Yellowstone locations also does not bar the 'small business' label because the Gonzalezes' business had nine terminal offices in addition to its headquarters. Yellowstone likewise had employees and independent contractors in nine locations.").  Accordingly, while the Court considers the number of LLB locations, its examination is primarily focused on the number of LLB employees at the Sunset Road office.

[15] Furthermore, a summary of LLB's tax records showed it employed more than forty-nine employees from 2013 to 2015. (*See* Mot. Compel Evidentiary Hear'g Tr.141:24–142:16) (showing LLB employed sixty-seven employees in 2013, seventy-six employees in 2014, and sixty-five employees in 2015).  "However, the [G]overnment did not have any information from the IRS to tell how many employees were employed by LLB in 2016 when the warrant was executed." (R&R 9:26–28) (citing Mot. Compel Evidentiary Hear'g Tr.143:1–25).

search or seizure.") (quoting *Rakas*, 439 U.S. at 130 n.1).  Defendant has neither offered evidence showing how many employees worked at the Sunset Road office, nor rebutted the Government's evidence that at least forty-nine people worked at the Sunset Road office.  In sum, the record before the Court establishes the Sunset Road office contained far more employees than that in *Gonzalez*.

> ### e.  Totality of the Circumstances

Considering the foregoing, the Court finds that LLB is not a "small business."  It is true Defendant had access to the entirety of the Sunset Road office and indirectly owned the building the Sunset Road office was located within.  But the Sunset Road office had far more employees than there were in *Gonzalez*, and perhaps most significant, Defendant neither had an ownership interest in LLB nor managed the day-to-day operations of the business.  He did not exercise daily management and control of LLB.  In sum, Defendant has not shown LLB falls under the *Gonzalez* small business label.  Because LLB is not a small business, Defendant does not have Fourth Amendment standing to challenge the entire search of the Sunset Road office.

The Court's conclusion does not mean Defendant is entirely without Fourth Amendment standing.  Even though Defendant does not have standing to challenge the entire search of LLB, the Court must next determine whether Defendant has standing to challenge the search of specific areas in LLB.

### 2.  Defendant's Standing to Search Areas Beyond His Office

Defendant maintains that he has standing to challenge the search of Lapito's office and cabinets. (Obj. 14:16–23).  In addition, Defendant contends that he has standing to suppress the contents of the brown bag containing binders, which Lapito held in her office for him. (*Id.* 14:24–15:25).

///

///

### a. Standing to Challenge Entire Search of Lapito's Office

The Magistrate Judge found that Defendant did not have standing to challenge the entire search of Lapito's office "for items seized other than his personal property." (R&R 16:4–5). Defendant argues this finding is contrary to the Supreme Court's holding "that a defendant has standing to search a shared office space." (Obj. 14:18–20); *Mancusi v. DeForte*, 392 U.S. 364, 368–89 (1968).

In *Mancusi*, the Supreme Court held that a union official had Fourth Amendment standing to challenge the government's search and seizure of documents taken from the office in which he worked. *Id.* at 364, 369. The office was a large room he shared with other union officials; it was not for his own exclusive use. *Id.* at 368. The official reasonably expected that no one would enter the office other than those with whom he shared the office and their invitees. *Id.* at 369. In other words, the official had a reasonable expectation of privacy in his "personal office." *Id.*

*Mancusi* confirms that one has an expectation of privacy in the contexts of his or her own office at a place of business, even if the office is shared. But here, Defendant claims he had an expectation of privacy in someone else's office: Lapito's. While Defendant had access to Lapito's office, her office was neither shared with Defendant nor given over to his exclusive use—it remained solely her office.[16] *See Salyer*, 814 F. Supp. 2d at 987 ("Neither *Mancusi* nor any of its progeny goes so far as to grant to defendant reasonable expectation of privacy in

---

[16] Lapito's testimony on this issue was the following:

Question: Now, talking about your specific office here on the Stable side, did you share your office with anybody?
Lapito: No.
Question: Did anyone else your office?
Lapito: No.
Question: Could [Defendant] come and go as he pleased from your office?
Lapito: Yes.

(Mot. Compel Evidentiary Hear'g Tr. 69:3–10).

someone else's office.").  And *SDI Future Health* makes clear that "mere access to, and even use of, the office of a co-worker 'does not lead us to find an objectively reasonable expectation of privacy.'" *SDI Future Health*, 568 F.3d at (quoting *Taketa*, 923 F.3d at 671).  In sum, Defendant's reliance on *Mancusi* is misplaced.  Defendant's mere access to Lapito's office does not vest him with Fourth Amendment standing to contest the search of *her* office. Other than his reliance on *Mancusi*, Defendant does not provide any other argument  to establish the Magistrate Judge's finding that he did not have standing over the search of Lapito's entire office was incorrect. (Obj. 14:10–15:8).  For the reasons set forth in the Magistrate Judge's R&R, (R&R 16:4–18), the Court finds that Defendant does not have standing to challenge the entire search of Lapito's office for items seized other than his personal property.

### b.  Standing to Suppress Brown Binders Stored in Lapito's Office

Defendant next argues that "he has standing to seek to suppress the contents of [Defendant]'s brown bag located in Lapito's office." (Obj. 14:25–15:1).  A defendant has standing to challenge areas beyond his personal office if he can show "some personal connection to the places searched and the materials seized." *SDI Future Health*, 568 F.3d at 698.  In making this determination, courts analyze three factors:

> (1) whether the items seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his behalf to secure the place searched or things seized from any interference without his authorization.

*Id.* at 698 (citing *United States v. Anderson*, 154 F.3d 1225, 1230–32 (10th Cir. 1998)).

Applying the *SDI Future Health* factors to the facts set forth above, Defendant does not have a sufficient personal connection with the place searched and materials seized to establish standing.  Here, Defendant gave Lapito a brown bag containing binders containing various

///

///

documents, including tax and financial documents, which Defendant compiled to give to the Government, which Lapito kept atop a credenza in her office.[17] (*Id.* 72:1–73:1, 116:1–15).

Under the first factor, Lapito testified the binders contained tax and financial documents related to LLB's operations and Walker's alleged data breach. (Mot. Compel Evidentiary Hear'g Tr. 72:8–73:1, 116:1–15). To the extent Defendant claims that "all the corporate, tax, [and] financial . . . documents" Lapito testified "about were personal [to Defendant], this was not established in her testimony."[18] (R&R 16:27–28). Moreover, there is no evidence the brown bag and binders were kept in a private place separate from other work-related materials. In sum, Defendant has failed to show that the brown bag and binders contained personal property, as distinguished from property directly related to LLB's operations, or that the property was kept in a separate place from other work-related material. *See United States v. Akpan*, No. 2:05-cr-00304, 2009 WL 418599, at *12 (D. Nev. Feb. 17, 2009) (finding that defendant did not have standing where he failed to show "that the Government seized evidence from the TMS premises that was in fact personal property as distinguished from property that had a relationship to his TMS business or that [he] took personal precautions to protect such property from being seized").

---

[17] Defendant represents that the binders also contained "attorney work product and privileged items." (Def. Post Hear'g Br. 54:27–28, ECF No. 133); (Def. Post Hear'g Reply Br. 30:10–16). In contrast, the Government maintains that Defendant's prior counsel identified a "single white binder" as "being potentially privileged attorney-client material." (Gov. Post Hear'g Br. 52:19–24, ECF No. 137). Despite having a three-day evidentiary hearing on his Motion, has failed to adequately develop the record to show the exact contents of the binders to corroborate his representation. *See Torres-Ramos*, 2008 WL 4667119, at *14 ("Part of the difficulty on this issue is that the record is not entirely clear regarding George Torres' relationship to the other areas searched. It is, of course, the Defendants' burden to present the Court with such evidence and to explain exactly what George Torres' relationship was to the areas searched."). It is Defendant's burden to show legitimate expectations of privacy in the searched premises. *United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995). Defendant's proffered representation fails to displace Lapito's testimony that the binders contained tax and financial documents that were not personal to him.

[18] Even if the items were Defendant's personal property, Supreme Court precedent makes clear that "it cannot suffice for Fourth Amendment standing to challenge the seizure of an item in the workplace that the item is the personal property of an individual." *SDI Future Health*, 568 F.3d at 698 n.7 (citing *O'Connor*, 480 U.S. at 715–16).

Under the second factor, Defendant does not dispute he did not have custody or immediate control of any items when agents seized them. (*See* Def. Post Hear'g Reply Br. 30:10–15) (writing that the brown bag containing binders was held by Lapito "in her area"). Instead, custody of the brown bag and binders resided with Lapito. (*Id.*).

Under the third factor, Defendant does not contend, nor does the record show, that he took precautions on his own behalf to secure the brown bags or binders from interference without his authorization.

Defendant has not established that any of the "personal connection" or "exclusive" factors that the Ninth Circuit has required to create a legitimate expectation of privacy are satisfied here. It is Defendant's burden of establishing his legitimate expectations of privacy. *Zermeno*, 66 F.3d at 1061. The evidence he has proffered fails to meet this burden.

**B. *Franks* Violation**

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006); *see SDI Future Health*, 568 F.3d at 703.

In *Franks v. Delaware*, the United States Supreme Court held that a defendant could challenge a warrant affidavit by showing that (1) the affiant recklessly or intentionally included false statements in the affidavit and (2) the false statements were necessary to finding probable cause. 438 U.S. at 155–56. The Ninth Circuit has extended *Franks* to cover situations in which

the affiant intentionally or recklessly omitted material facts from the affidavit. *United States v. Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995).  In other words, a *Franks* violation can be established when the defendant proves that (1) the affiant recklessly or intentionally omitted facts from the affidavit and (2) had the omitted facts been included, they would have destroyed probable cause. *Id.*; *see also United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017).  To determine if the omitted information is material or necessary to the probable cause determination, the Court asks whether probable cause remains after the omitted information is included. *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014).

Defendant argues that the warrant in this case was defective under *Franks* because the Government recklessly or intentionally omitted information about Ip's credibility from the Agent Elliot Affidavit, and had this information been included, "it is highly unlikely" the Magistrate Judge would have found probable cause existed to search LLB. (Obj. 3:24–27). Specifically, Defendant contends that Magistrate Judge Koppe would have found Ip was not credible if the Agent Elliot Affidavit included that Ip hacked into LLB's systems, stole documents, and then lied to the Government by telling them he maintained the documents while working at LLB.[19] (R&R 19:20–24) (citing Def. Post Hear'g Br. 46:16–27).  The Magistrate Judge disagreed with Defendant's argument, noting that even if the Government included the preceding omitted information, probable cause would have existed in part because

_____

[19] Defendant also argues Ip's lack of credibility "[is] further compounded by his significant bias toward [Defendant] coupled with his motive to cause [Defendant] financial harm." (Obj. 18:6–8).  The only evidence Defendant offers in support of his argument is his own argument from his Motion to Suppress. (*Id.*) (citing Def. Mot. Suppress 4:25–5:6).  As this Court has observed, "attorney argument is not evidence." *Torres v. Rothstein*, No. 2:19-cv-00594, 2021 WL 297124, at *4 n.9 (D. Nev. Jan. 27, 2021); *Bock-Kasminoff v. Walmart, Inc.*, No. 2:20-cv-00949, 2021 WL 8650490, at *3 (D. Nev. Aug. 30, 2021).  Defendant cannot contend that the Magistrate Judge erred in failing to find a *Franks* violation based on his attorneys' conclusions, which are not corroborated by evidence presented or proved at or before the evidentiary hearing.  The same reasoning applies to Defendant's averments surrounding Walker's alleged bias. (Obj. 2:27–3:1, 22:28, 24:15–16).  As the Magistrate Judge noted, Defendant "cites nothing in support of this assertion." (R&R 20:26).

the information contained on the Ip Drive was corroborated by other sources, and thus, any alleged omissions were not material.[20] (*Id.* 20:1–5).

### 1. Alleged Material Omissions & Corroborating Information

Relying primarily on *United States v. Simmons*, 771 F. Supp. 2d 908 (N.D. Ill. 2011), Defendant argues that the alleged material omissions "should have been provided to Magistrate Judge Koppe, whether corroborating documents existed or not." (Obj. 20:16–17);  The Court disagrees.

In *Simmons*, the Chicago Police Department obtained a search warrant based on information provided by a confidential informant ("CI").  After arresting the CI for drug-related activity, officers "asked the CI if there was anything he could do 'to get himself out of the situation he was in.'" *Simmons*, 771 F. Supp. 2d at 913.  Believing he would otherwise be charged for possession of heroin, the CI told CPD that the defendant was a felon and that the CI had seen firearms at the defendant's residence, which the defendant told the CI he kept for protection. *Id.* at 914.

///

---

[20] Defendant also seemingly advances that the Magistrate Judge decided the materiality issue "when [she] made a preliminary ruling that a *Franks* hearing was warranted," (*id.* 15:23–25), based on Defendant's "preliminary showing" that Ip and lied about how he obtained LLB related documents, and potentially engaged in illegal activity to obtain those documents. (*Id.* 15:25–16:6) (citing Order Granting *Franks* Hear'g 1:19–2:4, ECF No. 94).  To the extent Defendant construes this Order as a conclusive finding that had the issuing judge known Ip hacked into LLB's servers, it would have destroyed probable cause, he is mistaken.  Defendant's argument conflates his burden in obtaining a *Franks* hearing with that needed to merit suppression.  In this context, Defendant's burden of proof shifted from the lower hurdle of a "'substantial preliminary showing' at the motion stage to" the higher "'preponderance of the evidence' [standard] at the hearing stage.'" *United States v. Desu*, 23 F.4th 224, 235 n.4 (3d Cir. 2022); *see United States v. Rodriguez-Colon*, 827 Fed. App'x 188, 190 n.2 (3d Cir. 2020) ("The failure to clear the lower hurdle of a substantial preliminary showing means that Rodriguez-Colon cannot meet the higher 'preponderance of the evidence' standard for suppression.") (quoting *Franks*, 438 U.S. at 156).  Thus, while the existing materials sufficed for the substantial preliminary showing required for a hearing, it did not foreclose the possibility Defendant would ultimately fail to satisfy the *Franks* prongs at and following the hearing. *See United States v. Losch*, No. 19-cr-00294, 2020 WL 2084571, at *2 (D. Ariz. Apr. 30, 2020) ("Whether a *Franks* hearing is required and whether the defendant will prevail at the hearing are, of course, two separate issues.").  Contrary to Defendant's argument, the Magistrate Judge's preliminary ruling was not a conclusive finding information about Ip's hacking was material to probable cause.

Law enforcement did not corroborate the CI's information in any meaningful way.  They verified that the defendant was a felon through his arrest history, showed the CI pictures of the defendant and the defendant's residence, which the CI confirmed were the person and residence he was talking about, and drove the CI by the defendant's residence to point it out. *Id.* at 913. As the *Simmons* court observed, "nearly all of the corroboration involved the CI—not an independent source—verifying information provided to him by police." *Id.* at 924.

Moreover, law enforcement omitted from the affidavit that the CI provided this information because he was under arrest and believed he would be charged with drug possessions. *Id.* at 913–14.  The affidavit also failed to mention the CI's extensive criminal history, which included gang affiliation and giving a false name to police upon arrest. *Id.*  The court found that "given the weak police corroboration of the CI's statement and the absence of any other indicia of reliability of the CI and his statement, the omission of these facts was material." *Id.* at 917.

*Simmons* is distinguishable from this case in two material ways.  First, unlike the CI in Simmons, Ip and Walker's credibility are not diminished by the presence of an extensive criminal history. *Id.* at 917.  Second, there was much greater corroboration of Ip's statements and the Ip Drive than that in *Simmons*. (*See* Gov. Resp. Obj. 13:5–12) (detailing the various independent sources of corroboration).  Here, numerous independent sources corroborated Ip's statements and the Ip Drive, including: bank records, IRS records, Walker, Defendant's own statements in his recorded conversation with Walker, and Walker's hard drive. (*See* R&R 20:15–24:3) (recounting and examining the various sources of corroboration used by law enforcement).  In sum, the facts here differ significantly from that in *Simmons*.

Furthermore, the Court disagrees with Defendant's general contention that an omission, especially one pertaining to an informant's credibility, cannot be cured through corroboration. Past decisions by the Ninth Circuit and district courts within this Circuit have found an

omission was not material when other sources ultimately corroborated an informant's information. *See, e.g.*, *Meling*, 47 F.3d at 1555 (noting that information omitted "substantially eliminate[d]" informant's credibility but finding that information was not material, because "[t]he bulk of the evidence supporting probable cause came from other sources"); *United States v. Bishop*, 264 F.3d 919, 925 (9th Cir. 2001) (finding that independent corroboration by law enforcement is one way for a court to verify the reliability of an informant's information); *United States v. Moreno*, No. 4:22-cr-00027, 2023 WL 121083, at *6 (D. Idaho Jan. 6, 2023) (determining the confidential informant's credibility was bolstered by the fact his "information was ultimately corroborated by further police investigation"); *United States v. Castro-Valenzuela*, No. 17-cr-01028, 2018 WL 4925703, at *7 (D. Ariz. Sept. 19, 2018) ("Even if the Court concluded this information was recklessly omitted, the affidavit in entirety supported a finding of probable cause for the warrant and extensions. This additional information would not undermine the fact that law enforcement had corroborated the tip from the CS with an independent investigation."); *United States v. Liew*, No. 11-cr-00573, 2013 WL 4525738, at *3 (N.D. Cal. Aug. 26, 2013) ("SA Ho included facts from other sources, whose reliability has not been questioned, that would have provided probable cause to believe the Liews had engaged in criminal activity."); *United States v. Johnson*, No. 2:06-cr-0013, 2007 WL 594909, at *5 (D. Nev. Feb. 20, 2007) (finding an informant's criminal history being completely excluded from an affidavit was not material where the informant's tip was corroborated by independent evidence.  And here, ample corroborative evidence confirms the reliability of the Ip Drive's contents. (R&R 20:15–24:3); (Gov. Resp. Obj. 13:5–12).  Accordingly, the Court agrees with the Magistrate Judge that probable cause would have existed even if the alleged omissions concerning Ip's credibility were included in the Agent Elliot Affidavit, and thus, the alleged omissions are not material.

///

### 2.   Whether Corroboration Through Documents Discovered Through the Ip Drive is Permissible

Finally, Defendant argues that the sources of corroboration listed above cannot be used to find probable cause because they were obtained through the Government's review of the Ip Drive, and as a result, are not *independent* sources of corroboration. (Obj. 22:6–25:3).  Put differently, Defendant avers that the Government could not rely on the contents of the Ip Drive to further its investigation and obtain more information that ultimately corroborated the reliability of the Ip Drive.  In response, the Government argues that under *Burdeau v. McDowell*, 256 U.S. 465 (1921), it was entitled to use the Ip Drive to further its investigation because there is no evidence agents directed Ip's unauthorized entry into LLB servers.[21] (Gov. Resp. Obj. 6:17–7:9).

In *Burdeau*, the Supreme Court distinguished between government agents and private parties for purposes of the Fourth Amendment. 256 U.S. at 474–75. *Burdeau* considered whether the Fourth Amendment restricts the Government's ability to use papers incriminating an individual when those papers were volunteered to the Government by a private party who had stolen them. *Id.  Burdeau* disregarded the private theft, noting that although "[t]he Fourth Amendment gives protection against unlawful searches and seizures, . . . its protection applies to governmental action." *Id.* at 475.

The Ninth Circuit recently observed that the "consequences of *Burdeau* do not offend the more modern rationale of the Fourth Amendment exclusionary rule . . . [which] is most often explained on grounds of deterrence." *United States v. Phillips*, 32 F.4th 865, 867–88 (9th Cir. 2022) (quoting 1 Wayne R. LaFave, Search & Seizure § 1.8(a) (6th ed. 2021)). "Specifically, 'extension of the exclusionary rule to all private illegal searches for purposes of

---

[21] The Government "does not concede this fact" and maintains that no hack occurred. (Gov. Resp. Obj. 7:20–22).

deterrence would be difficult to justify' because 'the private searcher . . . is often motivated by reasons independent of a desire to secure criminal conviction and . . . seldom engages in searches upon a sufficiently regular basis to be affected by the exclusionary sanction.'" *Id.* (quoting 1 Wayne R. LaFave, Search & Seizure § 1.8(a)); *see also United States v. Janis*, 428 U.S. 433, 455 n.31 (1976) ("[T]he exclusionary rule, as a deterrent sanction, is not applicable where a private party . . . commits the offending act.").

Here, Defendant has "never argued" that the Government requested Ip steal documents, nor does the record support such a conclusion. (R&R 28:6–8); (*see also* Def. Reply Mot. Suppress 5:28–6:2, ECF No. 89) ("[Defendant] is not now contesting the admissibility of the documents contained on the Ip Drive at trial. If that were the issue before the Court, *Burdeau* might be relevant. But it is not.").  Instead, Agent Elliot testified that no government agent ever asked, questioned, or in any way directed Ip or Walker to obtain any information from LLB's files. (Evidentiary Hear'gg Day One Tr. 81:13–18, 103:16–105:14, 125:20–127:25, 128:10–13).  In this case, Ip, of his own volition, delivered the Ip Drive to the Government.  The Government's utilization of the Ip Drive, even if the drive was the product of Ip breaking into LLB servers, does not offend the Fourth Amendment.

Here, the record does not show the Government's use of the Ip Drive to further its investigation constitutes a violation of the Fourth Amendment.  Moreover, the Court is unpersuaded by Defendant's contention that the Government could not use the contents of the Ip Drive to obtain corroborating evidence.  Under Defendant's view, "independent" corroboration means the government can only corroborate information supplied by an informant with information separately obtained through its investigation; that is, Government cannot use the informant's information to ultimately further its investigation and obtain evidence corroborating the informant's tip.

///

But neither the Supreme Court nor the Ninth Circuit have adopted Defendant's view of "independent" corroboration.  And practically, if "corroborating evidence was required to independently [] 'establish [the] wrongdoing,' there would be no reason for the original evidence to be corroborated since the corroborative evidence would itself prove the existence of the crime." (Gov. Resp. Obj. 12:23–13:4).  In sum, the Court disagrees with Defendant's theory of "independent" corroboration and finds that based on the record before the Court, the Government permissibly relied on the contends of the Ip Drive as one of many to advance its investigation and corroborate the reliability of the Ip Drive.  Accordingly, the Court agrees with the Magistrate Judge that Defendant has failed to show a *Franks* violation occurred.

## IV.        CONCLUSION

**IT IS HEREBY ORDERED** that the Report and Recommendation, (ECF No. 149), is **ADOPTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress, (ECF No. 87), is **DENIED**, and Objection, (ECF No. 152), is **OVERRULED**.

**DATED** this __6__ day of September, 2023.

_____
Gloria M. Navarro, District Judge
United States District Court